**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| SUMMER BOISMIER;<br><br>Plaintiff,<br>v.<br><br>OKLAHOMA STATE BOARD OF EDUCATION;<br><br>An administrative agency of the State of Oklahoma;<br><br>OKLAHOMA STATE DEPARTMENT OF EDUCATION;<br><br>An administrative agency of the State of Oklahoma;<br><br>OKLAHOMA SUPERINTENDENT OF PUBLIC INSTRUCTION;<br><br>An official of the State of Oklahoma;<br><br>RYAN WALTERS;<br>SARAH LEPAK;<br>ZACHARY ARCHER;<br>DONALD BURDICK;<br>KATIE QUEBEDEAUX; AND<br>KENDRA WESSON;<br><br>In their individual capacities,<br><br>Defendants. | ) | Case No: |

**<u>COMPLAINT</u>**

Until 2022, Ms. Summer Boismier was a public-school teacher in Oklahoma. That career was stripped from her by her own state government, which retaliated against her because she criticized a statewide book ban and spoke out in defense of racial minorities and members of the LGBTQ+ community.

Ms. Boismier's downfall started in 2021. That year, the state enacted HB 1775, which forbid Oklahoma schools from teaching certain concepts about race, sex, gender, and sexuality. By officials' own admissions, HB 1775 was designed to restrict access to books that discuss racial minorities, LGBTQ+ people, and their experiences. Concerned that HB 1775 unlawfully targeted racial minorities and LGBTQ+ people, and that it discriminated based on content and viewpoint, Ms. Boismier did exactly what the Founders of the United States intended: She voiced her concerns in the public forum, posting on social media and participating in interviews on her own time and in her personal capacity.

Ms. Boismier's public speech drew the ire of many politicians, including Ryan Walters, who chaired the State Board of Education. Defendant Walters had cultivated a reputation as a culture-war crusader. He was known for pushing blatantly unconstitutional policies, such as an ideological purity test that he wanted to impose only on teachers from "liberal" states, and a ban on discussing anything he deemed too "woke." Defendant Walters immediately published a press release on official letterhead attacking Ms. Boismier's speech and beliefs, stating "[t]here is no place for a teacher with a liberal political agenda in the classroom," and "asking the Oklahoma State Board of Education to revoke her teaching certificate immediately." Defendant Walters also falsely claimed—and later recanted—that Ms. Boismier had been fired from her job. Ms. Boismier sued Defendant Walters for making these false statements. Furious with Ms. Boismier, Defendant Walters accelerated his retaliation by ordering Defendant State Department of Education to initiate proceedings to strip Ms. Boismier of her teaching license. When a neutral hearing officer found no basis to strip her license, the State Board of Education tossed out that conclusion, voting to revoke her license anyway.

Federal law protects people's right to disagree with government officials. But when Ms. Boismier held and expressed beliefs that differed from those of Walters and opposed discrimination and censorship, she was stripped of her teaching certificate, her career, and her ability to make a living. To regain her ability to teach and make a living, and to vindicate her constitutional and civil rights, Ms. Boismier files this lawsuit against the government and the officials who conspired to deprive her of those rights.

## PARTIES AND JURISDICTION

1. Plaintiff Summer Boismier is a resident of Oklahoma. She was previously a resident of Oklahoma between June 1988 and November 2022, and a resident of New York between December 2022 and May 2024. She currently resides in Oklahoma.

2. Defendant State Department of Education (SDE) is a state administrative body tasked with governing the public school system in the state of Oklahoma.

3. Defendant State Board of Education (SBE) is the governing board of the Defendant State Department of Education.

4. Defendant SBE is composed of six board members and the Oklahoma State Superintendent of Public Instruction (the "Superintendent").

5. The six board members of Defendant SBE are appointed by the Oklahoma Governor, with the advice and consent of the Oklahoma Senate, and each member serves a four-year term.

6. The duties of the SBE members include drafting the policies of Defendant SBE, approving Defendant SBE's budget, and hiring and firing the Superintendent, who serves as Defendant SBE's CEO.

7. Defendant Ryan Walters was the Oklahoma Secretary of Education from September 2020 to April 2023, and the Oklahoma Superintendent of Public Instruction from April 2023 to September 2025.

8. Superintendent Walters resigned from his role in government to be CEO of the Teacher Freedom Alliance on September 30, 2025—a private organization dedicated to eliminating teachers' unions. Although he no longer holds the role, Defendant Walters was the Superintendent of Public Instruction when Defendant SBE revoked Ms. Boismier's teaching license, so this Complaint refers to him as Superintendent Walters and Defendant Walters interchangeably.

9. Defendant Donald Burdick was at all times relevant hereto a member of the Oklahoma State Board of Education, and a resident of Oklahoma.

10. Defendant Sarah Lepak was at all times relevant hereto a member of the Oklahoma State Board of Education, and a resident of Oklahoma.

11. Defendant Katie Quebedeaux was at all times relevant hereto a member of the Oklahoma State Board of Education, and a resident of Oklahoma.

12. Defendant Zachary Archer was at all times relevant hereto a member of the Oklahoma State Board of Education, and a resident of Oklahoma.

13. Defendant Kendra Wesson was at all times relevant hereto a member of the Oklahoma State Board of Education, and a resident of Oklahoma.

14. On June 13, 2025, Plaintiff served a notice of tort claim on the Office of Management and Enterprise Services Risk Management Department. More than 90 days have passed with no action taken on the claim, which was deemed denied by operation of law on September 11, 2025.

15. The notice included allegations that one or more of the individuals acted outside the scope of employment at different times.

## FACTUAL ALLEGATIONS

### I. Ms. Boismier's Career as an Award-Winning Public-School Teacher and Advocate for Marginalized Communities.

16. Ms. Boismier was born and raised in Oklahoma.

17. Ms. Boismier attended public schools in Oklahoma from grade school to graduate school, from when she was five years old to the present day.

18. Ms. Boismier received her B.A. from the University of Oklahoma in 2009, and her M. Ed. from Southwestern Oklahoma State University in 2019.

19. Ms. Boismier is currently a doctoral student at the University of Oklahoma studying instructional leadership and academic curriculum.

20. Between 2014 and 2024, Ms. Boismier was a teacher certified by the Oklahoma State Department of Education under certificate #418154, which permitted her to teach English to students in grades 5–12.

21. Ms. Boismier began her career as a public-school teacher in 2014, teaching English in U.S. Grant High School in Oklahoma City.

22. Over the course of her career, Ms. Boismier taught 7th-grade language arts at the Middle School of Piedmont from 2015-2016. She taught Pre-AP English I, English I, English III, and AP English Language & Composition at Piedmont High School from 2016-2021. And she taught CP English II and Honors English II at Norman High School from 2021-2022.

23. During her tenure, Ms. Boismier was awarded the Masonic Teacher of Today by the Masonic Fraternity of Oklahoma in cooperation with the Oklahoma State Department of Education for outstanding services to the young people of Oklahoma.

24. Ms. Boismier was also a 2018 SKIE regional award winner, awarded by the K20 Center, which recognized her ability to link student learning with innovative technology use and the K20 IDEALS.

25. Ms. Boismier was Site Teacher of the Year for Piedmont High School and District Teacher of the Year for Piedmont Public Schools.

26. And in 2019, Ms. Boismier was named a Rising Star Teacher by the Oklahoma State Department of Education for demonstrating excellent early teaching skills, significant promise, and a strong commitment to her students' future.

27. Even before she began speaking against HB 1775, Ms. Boismier was an ardent advocate for historically marginalized communities.

28. Between 2018 and 2019, Ms. Boismier was the faculty sponsor for Piedmont High School's student-initiated Gender-Sexuality Alliance (GSA) club. That club was designed by LGBTQ+ students and their allies to create a safe, supportive environment to discuss identity, socialize, and work towards ending discrimination on campus.

29. In 2019, Ms. Boismier attended the National Council of Teachers of English (NCTE) Annual Convention as an official presenter. She gave a presentation titled "Identity & Inquiry: Selected Texts to Support Diverse Youth" about incorporating diverse texts, including those by and about LGBTQ+ and BIPOC individuals, into classroom readings through project-based learning.

30. In 2020, Ms. Boismier attended Black Lives Matter protests in Oklahoma City, sharing her experience with her colleagues and fellow teachers.

31. Between 2018 and 2022, Ms. Boismier displayed Pride and Progress Pride Flags in her classroom in support of students who are members of the LGBTQ+ community.

## II. Superintendent Walters's Mismanagement and Pursuit of Elected Office.

32. Defendant Walters was once a public-school teacher—that career ended in 2019, when he resigned from teaching to pursue a career in politics.

33. After he left teaching, Defendant Walters oversaw the Oklahoma Bridge the Gap program, which was supposed to help Oklahoma students learn at home during the pandemic, but was investigated by the FBI for spending $1.7 million on non-educational expenditures, such as kitchen appliances, power tools, furniture, and entertainment.[1]

34. In 2020, Governor Kevin Stitt nominated Defendant Walters to be the Oklahoma Secretary of Education.

35. The role of the Secretary of Education is to advance the governor's education policy initiatives regarding common education, higher education and career technology centers. The position is also responsible for working with the State Board of Education, college and university boards of regents or trustees, the Office of Educational Quality and Accountability, and the State Board of Career and Technology Education to advance their interests at the state level.

36. During his tenure as Oklahoma Secretary of Education, Superintendent Walters remained the executive of "Every Kid Counts Oklahoma," which is a nonprofit that advocates for school privatization and charter school expansion. Superintendent Walters received $120,000 a year for this concurrent work.[2]

[1] Nolan Clay, *FBI investigating after Oklahoma education funds misspent*, THE OKLAHOMAN, https://web.archive.org/web/20230811041743/https://eu.oklahoman.com/story/news/2023/08/10/fbi-investigation-misspent-education-covid-money-ryan-walters-nonprofit/70570734007/ (last visited October 1, 2025).

[2] Clifton Adcock, *Billionaire philanthropists pushing charter schools and school vouchers also fund Oklahoma's Secretary of Education's six-figure salary*, THE FRONTIER (May 19, 2022), https://www.readfrontier.org/stories/billionaire-philanthropists-pushing-charter-schools-and-school-vouchers-also-fund-oklahomas-secretary-of-educations-six-figure-salary/.

37. In 2022, Superintendent Walters announced his campaign for Oklahoma Superintendent of Public Instruction.

38. The role of the Superintendent of Public Instruction is distinct from the role of the Secretary of Education. The Superintendent is the chief executive officer of the State Board of Education, and is responsible for overseeing, implementing and reviewing the policies of the Oklahoma public school system, including licensure of teachers. Unlike the Secretary of Education—whose focus is on statewide policies that affect all educational institutions in Oklahoma—the Superintendent's role is more concentrated on the administration of the public K-12 school system.

39. During and after his campaign for Superintendent, Defendant Walters used his office to target individuals and groups with protected characteristics and those who expressed different beliefs than him, including and especially members of the LGBTQ+ community and racial minorities.

## III. Superintendent Walters Weaponizes His Governmental Authority to Target Dissenting Political Views.

40. During his campaign, Superintendent Walters claimed that he's "seen the propaganda that Democrats want in our schools. It's sick." He promised to "crack down on their anti-America curriculum," by "ban[ning]" curriculum that he deemed objectionable.

41. After taking office, Superintendent Walters continued his campaign rhetoric, claiming "[t]he radical anti-American beliefs of communism have no place in America or our schools! #neverwoke #nocommieclassrooms #traditionalAmerica #ccp." Along with this caption, he posted a grainy, black and white photo of a teacher who Superintendent Walters displayed as teaching "Communism" to young children. The blackboard behind the teacher reveals that the teacher was actually giving an introductory lesson on the French language.




*Ryan Walters Mischaracterizing a French Lesson as Communist Indoctrination*

42. Superintendent Walters appeared on a Fox Business segment entitled "OK Superintendent Taking Aim at Woke Teachers." When pressed to answer what it means to be "too woke," Superintendent Walters answered "transgender ideology . . . being pushed on kids." When asked how to combat "wokeness" in schools, Superintendent Walters promised to get "the teacher's unions," out of schools, which he considered the "enemy."

43. Superintendent Walters openly admitted that he wanted to impose his ideology on the Oklahoma public school system. He has stated that his goal was to "recruit[] [only] conservative teachers and end[] woke programs like DEI," showing that he is targeting teachers who don't share his beliefs.

44. Superintendent Walters brought his own narrow religious and political beliefs into the classroom. For instance, he visited an Oklahoma elementary school purportedly to read a book, but before he began, he prayed over the students, saying "Dear God, thank you for these wonderful students. And thank you for letting us be here today. God I want you to please be with the State of

Israel, our country, or nation, our state, and our schools. Thank you so much for the opportunity to be here with these wonderful students today. Amen."

45. Superintendent Walters also attempted to force students to listen to him speak about his own personal beliefs. According to one news outlet, Superintendent Walters sent a video of him discussing the Bible to multiple school districts, ordering them to show the video to their students. At least two school districts declined, citing an opinion from the Oklahoma Attorney General that advised there was no authority for Superintendent Walters to force students to watch him speak.

46. Superintendent Walters also sent a memo on official letterhead to all schools in the state, requiring them to teach the Bible and Ten Commandments, and enforce the "core values" of that religious text upon all students:

> Effective immediately, all Oklahoma schools are required to incorporate the Bible, which includes the Ten Commandments, as an instructional support into the curriculum across specified grade levels, e.g., grades 5 through 12. This directive is in alignment with the educational standards approved on or about May 2019, with which all districts must comply.
>
> . . .
>
> This is not merely an educational directive but a crucial step in ensuring our students grasp the core values and historical context of our country.
>
> . . .
>
> Adherence to this mandate is compulsory. Further instructions for monitoring and reporting on this implementation for the 2024/25 school year will be forthcoming.
>
> Immediate and strict compliance is expected.[3]

47. In the wake of conservative commentator Charlie Kirk's killing, Defendant Walters issued a press release stating "Any teacher posting defamatory and egregious comments will NOT

[3] Memorandum, State Superintendent of Public Instruction, Immediate Implementation of Foundational Texts in Curricula (June 27, 2024), https://www.documentcloud.org/documents/24780673-immediate-implementation-of-foundational-texts-in-curriculum/.

be teaching in Oklahoma classrooms and any school that refused to participate in a moment of silence and/or lower their flags for Charlie Kirk is currently under investigation."

**IV. Superintendent Walters Weaponizes His Governmental Authority to Target Members of the LGBTQ+ Community.**

48. Superintendent Walters has similarly used his governmental authority to target and demonize members and allies of the LGBTQ+ community.

49. For instance, Superintendent Walters claimed that "liberals" were discussing "whether they should allow litter boxes in the bathrooms for kids that identify as cats."[4]

50. These claims were a hoax designed to alienate transgender students and equate their decision to use their preferred bathroom with students pretending to be cats.[5]

51. In 2022, the Oklahoma legislature passed SB 615, which forbid transgender students from using the bathroom that aligned with their gender identity.

52. While this anti-trans rule was in effect, Nex Benedict, a nonbinary high school student, was physically assaulted in an Oklahoma high school bathroom by students who had previously bullied Nex for their gender identity. Nex died by suicide the next day.

53. In response to Nex's death, Superintendent Walters went on Fox News, not to discuss the tragic loss of Nex's life, or the epidemic of gender queer suicide, but to paint himself as the true victim because of criticism he received for his anti-trans policies and rhetoric. He denied that Nex was "bullied," and claimed that "the left and these LGBTQ groups are . . . attacking me, by attacking Oklahoma, by attacking conservative principles."

---

[4] Jonathan Nicholson, *Man Who Wants to Run Oklahoma's Schools Buys into Bogus 'Cat Litter' Conspiracy Theory*, HUFFINGTON POST (Nov. 4, 2022), https://www.huffpost.com/entry/oklahoma-school-superintendent-candidate-cat-litter_n_6365ccabe4b05f221e7a23d1.

[5] Shane Ross, *Rumours about students identifying as cats are rooted in hate, says P.E.I. Public Schools Branch*, CBC NEWS (Oct. 20, 2021), https://www.cbc.ca/news/canada/prince-edward-island/pei-psb-statement-cats-students-1.6218628.

54. Soon after Nex's death, the federal Department of Education revised its Title IX regulations to override blanket policies that forbade trans students from using the bathroom that aligned with their gender identity, such as SB 615.[6]

55. When pressed to defend SB 615, which implied that transgender students "were not accepted [as] part of our society," Superintendent Walters said that was "an absolutely absurd position. There's [sic] boys and there's [sic] girls. We want to protect girls' sports. We know there's [sic] two genders. . . . We're not going to allow a boy to go into a girls' bathroom because they claim to identify as a girl that day."

56. Around February 2024, an Oklahoma school principal dressed up in drag outside of school, in his personal capacity, on his personal time—an act that is protected by the First Amendment.[7]

57. Superintendent Walters appeared in multiple videos criticizing the principal, arguing that they should be fired for dressing up in drag on their own time. On one Fox News appearance addressing the principal, Ryan Walters claimed the "left" is "at war with our kids." "Their end goal is to absolutely break down a child's mind, break down [the] classroom, break down the family. . . . They want kids to turn on their parents and only listen to their leftist ideology. And how do you do it? You . . . say listen, you're gender fluid. Listen, you can change your programs. Listen, look at this sexual material. . . . It's just to create Democratic voters."

58. Superintendent Walters also targeted trans-supporters who were employees of his department. In one case, Superintendent Walters allegedly fired a lawyer for Defendant SDE, who

---

[6] Collin Binkley, *Biden's new Title IX rules protect LGBTQ+ students, but avoid addressing transgender athletes*, ASSOCIATED PRESS (April 19, 2024), https://apnews.com/article/title-ix-sexual-assault-transgender-sports-d0fc0ab7515de02b8e4403d0481dc1e7.

[7] Shane Murnan, *I'm proud of my work as a principal and drag queen. Nothing will change that.*, MSNBC (Feb. 14, 2024), https://www.msnbc.com/opinion/msnbc-opinion/oklahoma-principal-resigns-drag-queen-rcna138735.

had worked for the Department for over eight years, because she privately supported transgender students.[8]

59. Superintendent Walters bragged about his opposition to LGBTQ+ people. At a public event, he said:

> I have 350 LGBTQ+ radical groups nationally who demanded that I resign. They're demanding that I resign. They are demanding that I allow pornography in the classroom. They are demanding that I allow transgender education in the classroom. Well I'm here to tell you tonight, I will never back down to a woke mob.[9]

60. He even campaigned on promises to end discussions of sexual orientation, which he dubbed "sexual orientation training."

61. In short, Superintendent Walters's own professed goal was to target and discriminate against individuals and groups with protected characteristics and to ban schools from teaching ideas with which he disagrees, while encouraging educators to adopt and share his own beliefs and removing teachers who dissent from Oklahoma classrooms.

## V. Superintendent Walters Weaponizes His Governmental Authority to Target Racial Minorities.

62. Superintendent Walters also targeted racial minorities, invoking coded language to attack any person or book that discussed this country's enduring legacy of racial injustice.

63. Superintendent Walters claimed responsibility for the State Department of Education's standards, stating at a State Board of Education meeting "You're looking at the individual that made the decision on what's in the standards. I'm right here. Ultimately, I make the decision on what's in the standards and what's not."

---

[8] Diane Ravitch, *Oklahoma State Superintendent Fires Attorney Who Supported Trans Students*, DIANE RAVITCH'S BLOG (Feb. 3, 2023), https://dianeravitch.net/2023/02/03/oklahoma-state-superintendent-fires-attorney-who-supported-trans-students/.

[9] Ryan Walters, *350+ LGBTQ organizations calling for me to step down. I will NEVER BACK DOWN*, Facebook, https://www.facebook.com/reel/1479094642646698 (last visited Oct. 16, 2025).

64. At his direction, the State Department of Education revised its teaching standards to remove discussions of racial minorities, including changing a standard about curriculum on the New Deal to remove teaching on discrimination against Black people. He also removed education about the Black Lives Matter movement.

65. Most often, Superintendent Walters targeted any instruction on racism by framing it as "critical race theory," or "CRT."

66. Superintendent uses the phrase "CRT" or "Critical Race Theory" as a euphemism to describe any discussion or mention of racism either in the present or past.

67. In his campaign for state superintendent, Defendant Walters promised to "ban harmful programs like critical race theory," and "kick critical race theory out of classrooms."

68. Superintendent Walters demanded that book publishers remove anything that discussed CRT (i.e., racism), or Oklahoma would cease purchasing their books.[10]

69. In a letter, Superintendent Walters bragged that he and the Oklahoma State Department of Education "eliminated DEI, CRT, and woke indoctrination from our schools, while affirming religious liberty and American exceptionalism."

70. Superintendent Walters's actions were criticized by Black scholars, including Ibram X. Kendi, who said that Walters was "seeking to end instruction about racism and sexism" and revising standards to include unfounded claims about the 2020 presidential election. "He seemingly wants students to believe inequity stems from the inferiority of peoples and the 2020 election was stolen," Kendi wrote.

---

[10] Ray Carter, *Sec. Walters Tells Textbook Companies to Obey CRT Ban*, OCPA (May 12, 2022), https://ocpathink.org/post/independent-journalism/oklahoma-education-secretary-tells-textbook-companies-to-abide-by-crt-ban.

71. In response, Superintendent Walters fired back "The godfather of CRT, who got rich off shaming America and dividing kids by skin color, is furious about our standards. We're cleaning house. Thanks for the endorsement."

72. Superintendent Walters was pressed on what he meant by "CRT" by a citizen at a town hall, who asked whether teaching about the 1921 Tulsa Race Massacre would fall under his definition of CRT, and therefore be banned.

73. Superintendent Walters responded that teaching about racism is itself CRT, and should be banned: "[T]o say it was inherent because of their skin, is where I say that is critical race theory. You're saying that a race defines a person. I reject that."

74. The citizen followed up, pointing out that the "violence was about race," and asking "how does that not fall in your definition of CRT?" Superintendent Walters declined to answer.

75. Superintendent Walters is not alone in using the phrase "CRT" as a euphemism for "discussions of racism."

76. Although there is "little to no evidence that critical race theory itself is being taught to K-12 public school students," others have latched onto it as a "catchall phrase to describe racial concepts some conservatives find objectionable, such as white privilege, systemic inequality and inherent bias."[11]

77. Educators have raised alarms that bans on so-called "CRT" would "whitewash American history by downplaying the role past injustices still play today. They also fear a chilling effect on classroom discussions."

---

[11] Bryan Anderson, *Critical race theory is a flashpoint for conservatives, but what does it mean?*, PBS (Nov. 4, 2021), https://www.pbs.org/newshour/education/so-much-buzz-but-what-is-critical-race-theory.

78. That chilling effect came when the Oklahoma legislature, encouraged by Superintendent Walters, enacted a book ban in all Oklahoma public schools.

## VI. The Oklahoma Legislature Springs a Book Ban on Public-School Students.

79. During Ms. Boismier's tenure as a teacher, the political climate surrounding Oklahoma's public schools reached a boiling point.

80. When HB 1775 was first introduced, it was designed to provide emergency medical plans for athletic activities.[12] When the Oklahoma House of Representatives first passed HB 1775, it still served the core purpose of providing medical plans for athletic activities.[13]

81. But the Oklahoma Senate transformed HB 1775 into a prohibition on (1) trainings on race or sex stereotyping; and (2) teaching discussions of race or sex, or their impact on society.

82. The Oklahoma Legislature's Parliamentarian ruled that the Senate's rewrite of HB 1775 violated the Legislature's own rules, but still:

a. the Oklahoma Legislature voted to suspend those rules as to HB 1775;

b. the Oklahoma Legislature voted to pass HB 1775; and

c. Governor Stitt signed HB 1775 into law.[14]

83. On its face, HB 1775 claims to:

a. Ban discussions of race or sex stereotyping in orientation or orientation requirements; and

[12] *HB 1775 As Introduced*, OKLAHOMA STATE LEGISLATURE (Jan. 15, 2021), https://www.oklegislature.gov/cf_pdf/2021-22%20INT/hB/HB1775%20INT.PDF.
[13] *HB 1775 House Committee Substitute*, OKLAHOMA STATE LEGISLATURE (Feb. 23, 2021), https://www.oklegislature.gov/cf_pdf/2021-22%20COMMITTEE%20SUBS/HCS/HB1775%20CS.PDF
[14] Jonathan Kyncl, *OU Administration, student government react to passage of House Bill 1775,* OU DAILY (May 9, 2021), https://www.oudaily.com/news/ou-administration-student-government-react-to-passage-of-house-bill-1775/article_9468f35a-aeb4-11eb-9059-7b6ffac9a38e.html.

b. Ban certain discussions on the role that race and sex have played, and continue to play, in society.

84. One of the authors of HB 1775 has admitted that the law was designed to prevent teachers from presenting "a lie called intersectionality . . . system[ic] racism, inherent racism."[15]

85. Commentators have pointed out that the vague and broad law would appear to ban lessons discussing the Tulsa Race Massacre and their legacy in Oklahoma.[16] And "educators say a chilling effect has fallen on classrooms in teaching on complicated subjects like the Tulsa Race Massacre. . . . [F]our teachers [stated] they avoid some topics [such as the Tulsa Race Massacre] because they fear punishment."[17]

86. The 1921 Tulsa Race Massacre Centennial Commission, which was commissioned by the City of Tulsa to study and teach the legacy of the Tulsa Race Massacre, and of which Governor Stitt was a member, sent a letter to Gov. Kevin Stitt, stating:

> HB 1775 chills the ability of educators to teach students, of any age, and will only serve to intimidate educators who seek to reveal and process our hidden history. You know that. We delivered this message to you before you signed the measure. We were joined by educators, school boards, universities, faith, and community leaders, all of whom vigorously objected to HB 1775. You seemingly disregarded and dismissed this chorus of voices aligned against HB 1775.

---

[15] Ray Carter, *Senate Advances Ban on Critical Race Theory*, OCPA (April 22, 2021), https://ocpathink.org/post/independent-journalism/senate-advances-ban-on-critical-race-theory.

[16] Jillian Taylor, *After a state law banning some lessons on race, Oklahoma teachers tread lightly on the Tulsa Race Massacre*, THE FRONTIER (Aug. 3, 2023), https://www.readfrontier.org/stories/after-a-state-law-banning-some-lessons-on-race-oklahoma-teachers-tread-lightly-on-the-tulsa-race-massacre/.

[17] Recently, the U.S. District Court for the Western District of Oklahoma preliminarily enjoined the Oklahoma government from enforcing provisions of HB 1775 that could have otherwise (1) prohibited university orientations or requirements that discuss the role of sex, race, and bias, (2) prohibited K-12 teachers from discussing two of the concepts related to race and sex. *See* Order of Preliminary Injunction, *Black Emergency Resp. Team v. Drummond*, Case No. CIV-21-1022-G (W.D. Okla. June 14, 2024) (holding that these provisions were unconstitutionally vague).

## VII. In an Effort to Silence Criticisms of HB 1775 and Discussions of Race and Gender, Defendants Penalize Two Prominent School Districts.

87. HB 1775 began impacting public schools during the 2021-22 school year, when Mustang and Tulsa Public Schools were accused of violating HB 1775[18].

88. The Oklahoma Department of Education alleged that an "implicit bias training for Tulsa teachers 'more likely than not' included comments that were inspired by concepts HB 1775 prohibits, even though state officials acknowledged that the training didn't include any statements that are explicitly banned."[19]

89. Superintendent Walters claimed that in teaching about implicit bias, Tulsa Public Schools "ignore[d] state law that prohibits public schools from teaching Critical Race Theory."

90. As punishment for these trainings, Defendant SBE downgraded Tulsa's status to "accredited with warning," even though that punishment was a greater penalty than the Oklahoma State Department of Education recommended.

91. Defendant SBE similarly sought to decrease the accreditation of Mustang Public Schools, simply because "a middle school student felt uncomfortable being asked questions in a team-building activity whether anyone in the room had ever experienced discrimination."

92. The process by which Defendant SBE decided whether to downgrade MPS's accreditation was flawed and obscure: "The specifics of Mustang's violation were not discussed before the July 28 vote." And "[Defendant SBE] lowered Mustang's accreditation minutes after some members admitted they were unaware the district had even violated the law."

---

[18] Ray Carter, *Tulsa Schools Could Face Accreditation Downgrade*, OCPA (July 27, 2023), https://ocpathink.org/post/independent-journalism/tulsa-schools-could-face-accreditation-downgrade.
[19] Nuria Martinez-Keel, *Tulsa, Mustang penalties upheld as state board of education refuses to reconsider HB 1775 vote*, THE OKLAHOMAN (Aug. 26, 2022), https://www.oklahoman.com/story/news/education/2022/08/26/oklahoma-state-board-education-meeting-tulsa-mustang-public-schools-hb-1775-penalties-upheld/65418926007/.

93. A downgrade in accreditation is a poison pill for school districts. Tulsa Public Schools, for example, endured additional oversight and the departure of their superintendent as a result of their decreased accreditation. Tulsa Public Schools further risked being entirely defunded and disbanded if it did not convince the Defendant SBE to upgrade its accreditation.

94. Defendant SBE's decision to downgrade Mustang and Tulsa Public Schools' accreditations was motivated by Superintendent Walters and Defendant SBE's goal of stamping out educators' criticism of HB 1775 and any perspectives on race and gender with which they disagreed.

95. Defendants SDE and Walters made clear that they were using accreditation decisions to punish school districts that did not strictly align with and adopt their political views.

96. Defendant Walters once attempted to force every school district in the state to force their students to "honor the memory of Charlie Kirk who engaged high school and college students to talk about American exceptionalism, Christianity's role in society and our country's history, as well as conservative values."[20]

97. He also ordered every public school district to show every student *and their parents* a video of him praying, in which he stated: "The newly created Department of Religious Liberty and Patriotism will be working to thwart any attempts to disrupt our Oklahoma student's fundamental freedoms. In one of the first steps of the newly created department, we are requiring all of Oklahoma schools to play the attached video to all kids that are enrolled. We are also requiring that that school districts send this video to all parents as well."[21]

---

[20] *How Tulsa metro schools are responding to Ryan Walters' letter about moment of silence for Charlie Kirk*, NEWS ON 6 (Sept. 15, 2025), https://www.newson6.com/story/68c89142cd3d7755de01f925/charlie-kirk-moment-of-silence-oklahoma-schools.

[21] Jamieson Keefover, *Ryan Walters invites students to pray after announcing Bible purchase for AP gov. classes*, Fox 25 (Nov. 15, 2024), https://okcfox.com/news/local/ryan-walters-invites-students-to-pray-

98. In that video, Defendant Walters prayed for President Donald Trump and his political team:

> I'm going to go ahead and pray. Dear God. Thank you for all the blessings you've given our country. I pray for our leaders to make the right decisions. I pray in particular for President Donald Trump and his team as they continue to bring about the change to the country. I pray for our parents, teachers, and kids, that they get the best education possible and live high quality lives. I pray that we continue to teach love of country to our young people so our students understand what makes America great, and they continue to love this country.

99. Defendant Walters "threatened districts that don't follow his mandates, saying he'll downgrade district accreditation or subject them to special audits."[22]

100. Defendants SDE and Walters also threatened to downgrade the Edmond Public Schools accreditation status if they did not remove the critically acclaimed books "The Kite Runner" and "The Glass Castle" from their libraries.[23]

101. As recently as September 25, 2025, Defendant Walters was ordering every school in the state to open a chapter of a "Turning Point USA" group and threatening to downgrade the accreditation of their districts if they did not comply.[24]

102. Defendants SDE's and Walters's threats to downgrade accreditations unless schools and school boards adopted their subjective and personal viewpoints about race, gender, and

---

after-announcing-bible-purchase-for-ap-gov-classes-state-superintendent-oklahoma-office-religious-liberty-patriotism-trump-bible-administration-freedom-pray-students-schools.

[22] Murray Evans, *What happens to Ryan Walters' Bible mandate, others when he leaves? What senator says*, THE OKLAHOMAN (Sept. 30, 2025), https://www.oklahoman.com/story/news/education/2025/09/30/ryan-walters-oklahoma-bible-mandate-after-resignation/86425440007/.

[23] *Janelle Stecklein*, *Ryan Walters' war on pornography has gone too far by weaponizing Oklahoma school accreditation*, OKLAHOMA VOICE (Feb. 26, 2024), https://oklahomavoice.com/2024/02/26/ryan-walters-war-on-pornography-has-gone-too-far-by-weaponizing-oklahoma-school-accreditation/.

[24] Rachel Leingang, *Oklahoma official says all high schools will have Turning Point chapters after Charlie Kirk killing*, THE GUARDIAN (Sept. 24, 2025), https://www.theguardian.com/us-news/2025/sep/24/turning-point-oklahoma-high-schools.

sexuality were designed to punish those who publicly or privately disagreed with them on matters relating to manufactured hot-button issues.

103. Defendants SDE's and Walters's threats over accreditation decisions had that intended effect.

104. The head principal of Mustang High School said teachers experienced "paralyzing" fear ever since the accreditation downgrade. "We are fearful to think that a teacher at another site who's just trying to teach an activity over empathy who made a mistake is in danger of losing his job, of losing his certification, of contributing to Mustang Public Schools losing their accreditation," Principal Knowles said in public comment to the board. "The results of this action have had a negative impact on teaching and learning at Mustang High School."

105. As The Oklahoman reported, "Educators across Oklahoma have said they're afraid not only of the law but of the broad way the state Board of Education applied it. Tulsa was accused of breaking not the letter but the spirit of the law, and Mustang was penalized because a student felt uncomfortable."

## VIII. Fearing Backlash from the State Government Under HB 1775, NPS Forces Ms. Boismier to Ban Access to All Books in Her Classroom.

106. Initially, Ms. Boismier's employer, Norman Public Schools (NPS) made some strides to incorporate minority and LGBTQ+ perspectives into their schools. Specifically, NPS used grant money from the State Department of Education to purchase two books that shared minority perspectives:

a. *All Boys Aren't Blue*, by George M. Johnson, which contains essays following Johnson's journey growing up as a queer Black man in Plainfield, New Jersey and Virginia.

b. *Stamped: A Remix*, by Jason Reynolds and Ibram X. Kendi, which presents readers with explanations of how racist ideas start and spread, and explains how those ideas can be discredited.

107. But after the state government targeted Tulsa and Mustang Public Schools for sharing diverse perspectives, and after it became clear that Defendants SDE and Walters were willing to downgrade the accreditation of any school district that did not adopt their beliefs and speech, NPS's support for these perspectives evaporated.

108. Fearing the same backlash that plagued Tulsa and Mustang Public Schools, NPS developed a plan to preemptively silence speech that might run afoul of the SDE's and Walters's viewpoints in an effort to avoid penalties by Defendant SDE.

109. At the beginning of the 2022–23 school year, NPS called a meeting for its English and Language Arts teachers. At that meeting, NPS revealed that it was concerned about the state's recent decision to downgrade Tulsa and Mustang Public Schools' accreditation because some teachers in those districts discussed issues like race and gender, thereby straying too close to the topics that HB 1775 placed off-limits.

110. Desperate to ensure that NPS did not endure the same fate, Principal Hallie Wright ordered teachers to "restrict or remove student access to classroom libraries" until a government official advised (on a book-by-book basis) on which books were banned in light of HB 1775.

111. Principal Wright also informed the department that faculty would be asked to sign the below forms indicating compliance with NPS policy, which stated:

**Norman Public Schools High School Classroom Library**
**Best Practices & Expectations**

**When evaluating literature for high school classroom libraries, books must:**

- align with NPS Board Policy 5002 and 5002-01-R.
- have been read in its entirety or have at least 2 professional reviews about the book.
- fall into an appropriate lexile range for the intended audience.
- contain content that is appropriate for the intended audience.
- depict real people, places, events, and time periods with authenticity and accuracy.
- reflect diverse perspectives, cultural practices, and social identities.

**When evaluating literature for high school classroom libraries, any language, violence, or sexual content must be appropriate for the intended audience.**

**When evaluating literature for high school classroom libraries, be mindful of the following topics and their context within the book:**

| | | |
|---|---|---|
| Drinking/drugs/tobacco | frightening content | language |
| Mental health | racial sensitivity | religion |
| Sexual/suggestive content | violence | weapons |

**For guidance regarding what is appropriate for your age group, please visit with your librarian.**

*Reading materials that were part of a district wide curriculum adoption have been approved.

*Text of Policy NPS Forced Teachers to Sign the Day Before School Began*

**Teachers Signature Sheet**
Classroom Library

NPS values the professional judgment of our teachers but also recognizes that teachers also need clear expectations and guidelines. It is always our goal to ensure our teachers are supported and informed. We also recognize that each teacher has unique and individual needs. If you have questions or need additional support while reviewing your classroom library, please speak with your principal. When reviewing your classroom library, if you have books that you are unsure if they meet the criteria or not, please collaborate with your principal, school librarian, or curriculum content coordinator.

Please read and sign:

I have read and understand the classroom library statement, NPS Board Policy 5002 and 5002-01-R, and the Classroom Library Best Practices & Expectations. I also understand that as a teacher with a classroom library, I must either 1) review the books that students have access to in my classroom prior to the first day of school and remove any books that do not meet the criteria or I am unsure of or 2) pause student access to my classroom library until I have time to review the books. While I review the books in my classroom, students will continue to have access to check out books from the school library. Last, I acknowledge I will complete a classroom library inventory using a district-wide database system no later than December 16, 2022.

I am choosing to:

____ review the books that students have access to in my classroom ***prior to the first day of school*** and remove any books that do not meet the criteria or I am unsure of.

____ pause student access to my classroom library until I have time to review the books.

**OR**

___ Other than district adopted textbook materials, I do not have any books in my classroom that students access or check out.

*Text of Signature Page of Policy NPS Required Teachers to Sign*

112. Assistant Principal Greg Willis suggested that in order for teachers to comply with this guidance, they would have to turn their books so the spines faced inwards or cover their shelves with butcher paper.

113. On August 12–15, 2022, before the beginning of the school year, Ms. Boismier complied with NPS's orders, covering all the books in her classroom with red butcher paper.

114. Wanting her students to have access to at least some books in the meantime, she placed a small QR code on the covered bookshelf that linked to the Brooklyn Public Library's website. The link did not lead to any specific book or section. Instead, it linked only to a public page where anyone ages 13–21 could sign up for a free library card.




*Screenshot of the Page that the QR Code Would Have Directed to as of October 2022*

115. Besides the QR code, she wrote in black marker: "Books the state doesn't want you to read" and inserted the tongue-in-cheek phrase "Definitely don't scan." She did not refer to any specific books.

116. NPS's first day of school was August 19, 2022. At the end of that day, after the end of Ms. Boismier's contract hours, Norman High School (NHS) administrators, including Principal Hallie Wright, visited Ms. Boismier's classroom, and informed her that she would be put on administrative leave pending a meeting at district offices.

117. NHS administrators then called the home of every student in Ms. Boismier's class, informing them that Ms. Boismier had posted the QR code in her classroom, and that she had been removed from her classroom.

118. Someone other than Ms. Boismier, presumably one of the parents who were called by NHS, contacted FOX 25 reporter Wendy Suares and informed her that NPS was taking disciplinary action against Ms. Boismier.

119. On August 23, 2022, Ms. Boismier, joined by her union representative Carnie Cullen, met with Principal Wright and Holly Nevels at the NPS district offices.

120. That meeting made clear that Ms. Boismier's working conditions at NPS would be intolerable in light of her personal opinions and speech opposing HB 1775.

121. Following the meeting with Principal Wright and Holly Nevels, Ms. Boismier told both Ms. Cullen and Ms. Suares that she intended to resign from NPS effective August 24, 2022.

122. On August 24, 2022, Ms. Boismier in fact resigned from NPS.

## IX. Ms. Boismier Continues to Advocate With and on Behalf of Historically Marginalized Communities.

123. After her resignation, Ms. Boismier continued her legacy of public advocacy against HB 1775 and in favor of racial minorities and the LGBTQ+ community.

124. Before the start of the 2022–23 school year, Ms. Boismier posted a Twitter thread, displaying what her classroom looked like "before" and "after" HB 1775. These images showed that because of HB 1775, Ms. Boismier was forced to cover all books in her classroom. Ms. Boismier further stated that because of HB 1775, her students "no longer have access to books by BIPOC, LGBTQ+, and/or gender non-conforming authors because state leadership has spent the last year loudly labeling these books and their stories/perspectives as pornography, as indoctrination."[25]

125. On August 25, 2022, Ms. Boismier participated in a televised interview regarding her criticisms of HB 1775.[26] In that interview, Ms. Boismier stated "it's vitally important that our students feel empowered, [and] see themselves reflected and validated. For too long, education, public education, has not included those stories." When asked if she knew that her actions would cause a "critical race theory" complaint, Ms. Boismier responded that "every educator in Oklahoma, since the passage of [HB] 1775, has understood that it's not a matter of if, it's a matter of when." When the interviewer pointed out that Ms. Boismier placed the blame squarely on the legislature, on the governor, and that she did not blame the district, Ms. Boismier responded that

[25] Ms. Boismier, M.Ed. (@MsBoismier_ELA), X (Aug. 12, 2022, 6:05 PM) https://x.com/MsBoismier_ELA/status/1558243400092090370.
[26] *I am a Walking HB 1775 Violation*, YOUTUBE (Aug. 25, 2022), https://www.youtube.com/watch?v=cFuxsO9cRT4.

"Norman Public Schools, and every school district in the state, is in a difficult position. . . Districts are scared, the law has done exactly what it was intended to do."

126. On August 30, 2022, Ms. Boismier participated in a nationally broadcast interview regarding her criticisms of HB 1775.[27] In that interview, Ms. Boismier said that "teachers are concerned that [HB 1775] is a violation of students' rights because [it has] allowed a small group of people to dictate which identities, perspectives, and conversations are allowed in our classrooms."

127. On September 26, 2022, Ms. Boismier participated in an interview with the Center for Brooklyn History regarding her criticisms of HB 1775 and her support for the right to read.[28] When discussing HB 1775, Ms. Boismier said that she didn't "know how you comply with it . . . And I think people including its authors know that. It has put school district administrators in an impossible position. They are having to choose between protecting their teachers and keeping their schools open. That should never be an either/or proposition." She took on Defendant SBE and the individual Defendants, claiming they were "political," and had made "education political" in Oklahoma. She also highlighted how Defendants were wielding accreditation to punish schools for not adhering to their political vision. Then then turned directly to the "Secretary of Education" Walters, who claimed that Ms. Boismier was "distributing pornography." Ms. Boismier then "encourage[d] the Secretary of Education to sit down a hold a writing conference with [Ms. Boismier] as well, because revision is important, and he had to release two versions of that statement. They're both wrong."

---

[27] *'Students Deserve to See Their Lives Validated:' Teacher Who Quit Over Banned Books Continues Fight*, YOUTUBE (Aug. 30, 2022), https://www.youtube.com/watch?v=82bD2Kng4_4&t=2s.
[28] *CBH Talk: The Battle for the Right to Read What You Want*, YOUTUBE (Sept. 26, 2022), https://www.youtube.com/watch?v=EY25YmOeHDs.

## X. Defendant SBE, Superintendent Walters, and Their Supporters Harass, Dox, and Punish Ms. Boismier, Forcing Her to Leave the State.

128. Superintendent Walters soon caught wind that Ms. Boismier had resigned from NPS in light of her personal opinions on HB 1775 and the harm being done to minority communities.

129. Even after she resigned from NPS, Defendant SBE, Superintendent Walters, and their supporters continued to persecute Ms. Boismier.

130. On August 31, 2022, Superintendent Walters, who was Oklahoma's Secretary of Education at the time, published a pair of letters about Ms. Boismier to his X account.

**Ryan Walters**
Office of the Secretary of Education
State of Oklahoma

**Oklahoma State Board of Education:**

In light of recent events leading to the subsequent firing of Norman High School English Teacher Summer Boismier, I am asking the Oklahoma State Board of Education to revoke her teaching certificate immediately. There is no place for a teacher with a liberal political agenda in the classroom. Ms. Boismier's providing access to banned and pornographic material to students is unacceptable and we must ensure she doesn't go to another district and do the same thing. This action must be dealt with swiftly and with respect to all our kids and parents.

Teachers are one of our state's greatest assets and it is unfortunate that one of them has caused such harm and shame for the entire profession. This type of behavior will not be tolerated in Oklahoma and I speak for parents across the state who are demanding swift and immediate action.

Kids first,

Ryan Walters

Ryan Walters

Oklahoma Secretary of Education

*Superintendent Walters's First Letter Regarding Ms. Boismier*

131. Defendant Walters was forced to quickly issue a second letter, walking back the lie that Ms. Boismier was fired, but he maintained his inflammatory and false statement that she was providing access to "pornographic material to students."

**Ryan Walters**
Office of the Secretary of Education
State of Oklahoma

**Oklahoma State Board of Education:**

In light of recent events involving Norman High School English Teacher Summer Boismier, I am asking the Oklahoma State Board of Education to revoke her teaching certificate immediately. Upon review of the situation, the teacher resigned rather than face removal. There is no place for a teacher with a liberal political agenda in the classroom. Ms. Boismier's providing access to banned and pornographic material to students is unacceptable and we must ensure she doesn't go to another district and do the same thing. This action must be dealt with swiftly and with respect to all our kids and parents.

Teachers are one of our state's greatest assets and it is unfortunate that one of them has caused such harm and shame for the entire profession. This type of behavior will not be tolerated in Oklahoma and I speak for parents across the state who are demanding swift and immediate action.

Kids first,

Ryan Walters

Ryan Walters

Oklahoma Secretary of Education

*Superintendent Walters's Second Letter Regarding Ms. Boismier*

132. Ms. Boismier spoke to The Oklahoman about these comments, stating "Fellow Oklahomans, this is the Republican candidate for State Superintendent . . . . His words speak for themselves. Please vote accordingly."[29]

133. Ms. Boismier also spoke to newspapers about HB 1775, stating "I can't think of a single example in history where the folks who have been banning the books turn out to be the quote-unquote good guys . . . . I am wholesale opposed to restricting access to information. If I am forced to do that very thing, then I want to make sure students understand that this is not a conviction that I hold."[30]

134. The same day that Superintendent Walters issued public letters accusing her of providing "pornographic material to students," Ms. Boismier began receiving a flood of threatening messages.

135. One email, which Ms. Boismier received the same day that Superintendent Walters accused her of being a child predator, included graphic threats and Ms. Boismier's personal address.

136. "These teachers need to be taken out and shot," "teachers like this should not only be fired but also should be swinging from a tree," "If Summer tried this in Afghanistan, they'd cut out her tongue for starters," are just a minuscule fraction of the threats that poured into Summer Boismier's inbox.

---

[29] Nuria Martinez-Keel, *Ryan Walters calls to revoke certification of Norman teacher who resigned over HB 1775*, THE OKLAHOMAN (Aug. 31, 2022), https://www.oklahoman.com/story/news/education/2022/08/31/ryan-walters-calls-to-revoke-former-norman-teacher-summer-boismier-certification/65466233007/.

[30] Nuria Martinez-Keel, *'An impossible position': Oklahoma teacher resigns over HB 1775*, THE OKLAHOMAN (Aug. 28, 2022), https://www.oklahoman.com/story/news/education/2022/08/28/oklahoma-teacher-resigns-over-race-gender-law-house-bill-1775-crt-critical-race-theory/65457353007/.

137. To protect her physical safety, Ms. Boismier called the OKC Police Department and filed a report.

138. When the threatening and harassing messages did not abate, Ms. Boismier moved to Brooklyn, New York, for a job as a Teen Initiatives Project Manager with the Brooklyn Public Library. Moving had the added benefit of putting space between herself and the retaliation, persecution, and threats lodged by Defendants and their supporters.

139. Even after she left Oklahoma, Defendants and their supporters continued to target Ms. Boismier, aiming to make an example out of her, and silence any employee who would speak out against them or HB 1775.

140. Following Superintendent Walters's lead, a group of Republican legislators called on Defendant SDE and the Oklahoma Department of Education to investigate Ms. Boismier's teaching certificate, alleging she violated HB 1775.

141. On February 23, 2023, even though she had already left her job at NPS and moved to Brooklyn, counsel for Defendant SDE notified Ms. Boismier that an application had been submitted to revoke her teaching certificate.

142. On August 30, 2023, Ms. Boismier filed a defamation lawsuit against Defendant Walters, alleging that his press releases—which falsely claimed she was fired from NPS—defamed her.

## XI. The Oklahoma Administrative Code Guarantees Ms. Boismier the Right to Notice and an Opportunity to Be Heard.

143. Under its own rules, Defendant State Department of Education could revoke a teaching certificate only for:

a. A <u>willful</u> violation of a rule or regulation of the State Board of Education, or the United States Department of Education;

b. A willful violation of any federal or state law;

c. A conviction for any of the offenses or bases for revocation set forth in 70 O.S. §§ 3-104 or 3-104.1; or

d. For other proper cause, including but not limited to violation of the Standards of Performance and Conduct for Teachers at Chapter 20, Subchapter 29 of this Title (Oklahoma Administrative Code ("OAC")).

144. Before Defendant State Department of Education can revoke a teaching certificate, it must first provide the applicant with notice of the charges and allegations against her and give her the opportunity to respond to these charges at a hearing.

145. The hearing to revoke an application can take one of two forms: The State Board of Education can hold the hearing itself, or "[t]he Board, at its discretion, may utilize a hearing officer to conduct the hearing. If utilized, the hearing officer shall be appointed by the Chairperson of the Board."

146. If Defendant SBE taps a hearing officer to preside over the hearing, the hearing officer shall decide "whether the certificate shall be revoked."

147. This hearing officer can revoke a certificate only if the applicant proves that the teacher violated one of the four enumerated provisions by "clear and convincing evidence." If they don't, "the application [to revoke the license] shall be dismissed."

148. After the hearing officer announces its initial decision, the parties must be afforded an opportunity to prepare and submit proposed findings of fact and conclusions of law. Only then can Defendant SBE accept, reject, or modify the hearing officer's proposed findings of fact and conclusions of law.

149. Even then, there are limits on Defendant SBE's discretion. Defendant SBE's decision shall be based exclusively on the evidence that is presented during the hearing, or is otherwise in the record. And revocation is permitted only if the applicant has proved that the teacher violated one of the four enumerated violations by "clear and convincing evidence."

## XII. A Neutral Hearing Officer Rejects the Request to Revoke Ms. Boismier's Teaching License, but Defendants Summarily Overrule the Hearing Officer.

150. On June 21, 2023, Defendant SBE held a virtual hearing to decide whether to revoke Ms. Boismier's license ("Revocation Hearing").

151. This Revocation Hearing was presided over by Liz Stevens, an assistant attorney general with the Office of the Oklahoma Attorney General.

152. Hearing Officer Stevens heard testimony from Holly Nevels (Associate Superintendent and Chief Human Resources Officer for NPS), Hallie Wright, and Ms. Boismier, and accepted into evidence The State Department of Education's Exhibits 1, 2, 3, 4, 5, 6, 7, 8, and 10. (Ex. 1, Hearing Officer's Findings & Conclusions).

153. The State Department of Education's case was premised on the allegation that Ms. Boismier gave her students access to the books *Gender Queer, Lawn Boy,* or *Stamped*, and she should therefore be punished.

154. *Gender Queer* is a 2019 American graphic memoir written and illustrated by Maia Kobabe, which recounts Kobabe's journey from adolescence to adulthood and the author's exploration of gender identity and sexuality, ultimately identifying as being outside of the gender binary. It has been banned from shelves in more states than any other book, largely by anti-LGBTQ+ activists who deplore its discussion of LGBTQ+ perspectives. Defendants in this case sought to punish Ms. Boismier for allegedly agreeing with the perspectives displayed in the book and affiliating with the community members depicted therein.

155. *Lawn Boy* is a semi-autobiographical coming-of-age novel written by Jonathan Evison. It tells the story of Mike Muñoz, a young adult Mexican American who has faced hardship ever since his childhood and is now going through a phase of self-discovery. It has been banned in many states across the country, largely by anti-latino and anti-LGBTQ+ activists who deplore its discussion of perspectives of LGBTQ+ people and racial minorities. Defendants in this case sought to punish Ms. Boismier for allegedly agreeing with the perspectives displayed in the book and affiliating with the community members depicted therein.

156. *Stamped* discusses the history of racist ideas in America, and inspires hope for an antiracist future. It takes the reader on a race journey from then to now, shows them why they feel how they feel, and why the poison of racism lingers. It also proves that while racist ideas have always been easy to fabricate and distribute, they can also be discredited. It has been banned in many states across the country, largely by activists who deplore its discussion of racism and racial minorities. Defendants in this case sought to punish Ms. Boismier for allegedly agreeing with the perspectives displayed in the book and affiliating with the community members depicted therein.

157. At the conclusion of the Revocation Hearing, Hearing Officer Stevens announced her preliminary findings from the bench: "[T]he State Department of Education has failed to prove by clear and convincing evidence that [Ms. Boismier] has willfully committed an act of moral turpitude and then violated the standards of performance and conduct for teachers."[31]

158. None of the members of Defendant SBE, including Superintendent Walters, were present at the Revocation Hearing. The Revocation Hearing was not open to cameras. And the Revocation Hearing transcript was not created until June 30, 2023. So, by June 22, 2023, the

---

[31] Jessie Christopher Smith, *School officials 'failed to prove' teacher violated law by helping students get books, prosecutor says*, USA TODAY (June 22, 2023), https://www.usatoday.com/story/news/nation/2023/06/22/no-proof-teacher-violated-oklahoma-book-law-prosecutor/70347891007/.

members of Defendant SBE, including Superintendent Walters, had no insight into what evidence was introduced at the Revocation Hearing.

159. Despite having no insight into what evidence was and was not presented at the Revocation Hearing, on June 22, 2023, Superintendent Walters promised the press that he "intend[ed] to finalize [Ms. Boismier's] license revocation in August."

160. Even though Superintendent Walters was winding up to revoke Ms. Boismier's license anyway, Hearing Officer Stevens issued a written Findings of Fact, Conclusions of Law, and Recommendation on August 8, 2023, which laid out in detail why Defendant SBE had failed to prove a basis to revoke Ms. Boismier's teaching certificate.

A. The neutral hearing officer rejects SDE's Count 1.

161. On Count One of the State Department of Education's Application for Revocation, Hearing Officer Stevens held that each of the SDE's allegations were without basis.

162. Defendant SDE alleged that: "Ms. Boismier willfully encouraged minor students to access explicit sexual material." Conversely, the Hearing Officer Stevens found that (1) Ms. Boismier denied having a copy of *Gender Queer* in her classroom and "[n]o corroborating evidence of its existence in the classroom, like a photograph, was introduced." There was "[n]o evidence" that Defendant used the books *Gender Queer*, *Lawn Boy*, or *Stamped*[32] in her instruction; that Ms. Boismier shared any of the books with students; that any student accessed, attempted to access, or was provided access with any these books; or that Ms. Boismier encouraged any student to read any of these books.

[32] Ms. Boismier contests that "sexually explicit materials" are the basis for Defendant SDE's hostilities to these books. Instead, the record is replete with evidence that this characterization is the result of discriminatory animus and political expediency.

163. Defendant SDE alleged that "Boismier willfully encouraged minor students to access the book *Gender Queer* in particular." Ms. Boismier denied having a copy of *Gender Queer* in her classroom and "[n]o corroborating evidence of its existence in the classroom, like a photograph, was introduced." And if a copy did exist in Ms. Boismier's classroom, it was covered by the butcher paper and inaccessible to students. There was no evidence that Ms. Boismier used the books *Gender Queer*, *Lawn Boy*, or *Stamped* in her instruction; that Ms. Boismier shared any of the books with students; that any student accessed, attempted to access, or was provided access with any these books; or that Ms. Boismier encouraged any student to read any of these books.

164. Defendant SDE alleged that "Promoting a sexually explicit book like *Gender Queer* to minors is an act of moral turpitude that fails to protect students from conditions harmful to learning and that fails to fulfill the responsibilities of teaching with honor and integrity." Even if that were true (and Ms. Boismier denies that it is), there was disputed evidence about whether Ms. Boismier possessed the book *Gender Queer*. While one witness claimed to have seen it among Ms. Boismier's books, Ms. Boismier disputed that she had a copy in her classroom. And there was no corroborating evidence (such as a photograph) showing that Ms. Boismier possessed, let alone "promot[ed]," the book *Gender Queer*.

165. Defendant SDE alleged that "Promoting a sexually explicit book like *Lawn Boy* to minors is an act of moral turpitude that fails to protect students from conditions harmful to learning and that fails to fulfill the responsibilities of teaching with honor and integrity." Even if that were true (and Ms. Boismier denies that it is), there is no evidence Ms. Boismier possessed, let alone "promot[ed]," the book *Lawn Boy*.

166. Defendant SDE alleged that "By willfully committing an act of moral turpitude, Boismier has violated the Standards of Performance and Conduct for Teachers." Given there was

no evidence—much less clear and convincing evidence—that Ms. Boismier engaged in *any* of the conduct alleged, there was no basis to conclude that she engaged in acts of "moral turpitude."

167. Accordingly, Hearing Officer Stevens concluded that "there was no evidence presented that [Ms. Boismier] used the three identified books—*Gender Queer*, *Lawn Boy*, or *Stamped*—in class instruction or otherwise shared the books with students. Furthermore the evidence showed that the QR code shared by [Ms. Boismier] linked to a library card application page, and there was no evidence presented that any of [Ms. Boismier's] students obtained a Brooklyn Public Library Card or accessed any books through the Brooklyn Public Library."

B. The neutral hearing officer rejects SDE's Count 2.

168. As for <u>Count Two</u> of the State Department of Education's Application for Revocation, Hearing Officer Stevens similarly held that each of their allegations was without basis.

169. Defendant SDE alleged that Ms. Boismier "encouraged students to read the book *Stamped* with the intent of violating the[] rules." However, Hearing Officer Stevens found that there was no evidence that Ms. Boismier used the books *Gender Queer*, *Lawn Boy*, or *Stamped* in her instruction; that Ms. Boismier shared any of the books with students; that any student accessed, attempted to access, or was provided access with any these books; or that Ms. Boismier encouraged any student to read any of these books. (*Id.*)

170. Defendant SDE alleged that Ms. Boismier "encouraged students to read [*Stamped*] during her high school English 2 class. "Again, not true. Hearing Officer Stevens found that there was no evidence that Ms. Boismier used the books *Gender Queer*, *Lawn Boy*, or *Stamped* in her instruction; that Ms. Boismier shared any of the books with students; that any student accessed, attempted to access, or was provided access with any these books; or that Ms. Boismier encouraged any student to read any of these books.

171. Defendant SDE alleged that Ms. Boismier stated that she was "a walking HB 1775 violation." That statement, which Ms. Boismier made to media members outside of work, in her personal capacity, was presented without context. It shed no light on whether Ms. Boismier had introduced students to the book *Stamped*, which was the allegation in Count 2.

172. Defendant SDE alleged that Ms. Boismier stated that she "would do it again in a heartbeat. No regrets. Would do it again. Will do it again." Again, that statement was made to media, outside of work, in Ms. Boismier's personal capacity. It sheds no light on whether Ms. Boismier had introduced students to the book *Stamped*, which is the allegation in Count 2.

173. Ultimately, Hearing Officer Stevens concluded that SDE "failed to prove by clear and convincing evidence that [Ms. Boismier] had willfully violated" any of the Oklahoma Administrative Code, because "there was no evidence presented that *Stamped* was in [Ms. Boismier's] classroom, that [Ms. Boismier] used *Stamped* in class instruction or activity, or otherwise shared the book with students." While Ms. Boismier posted a QR Code in her classroom, that code "linked to a library card application page, and there was no evidence presented that any of [Ms. Boismier's] students obtained a Brooklyn Public Library card or accessed any books through the Brooklyn Public Library,"—let alone *Stamped*.

174. Ultimately, Hearing Officer Stevens's Recommendation was that "[b]ased on the above findings of fact and conclusions of law, [Ms. Boismier's] teacher certificate **shall not** be revoked."

## XIII. Superintendent Walters Compels Defendant SBE to Arbitrarily Reverse Hearing Officer Stevens's Recommendation and Revoke Ms. Boismier's Teaching Certificate.

175. On June 27, 2024, Defendants Burdick, Lepak, Quebedeaux, Wesson, Archer, and Walters voted unanimously to reject Hearing Officer Stevens's Findings of Fact, Conclusions of Law, and Recommendation.[33]

176. But at the time they rejected Hearing Officer Stevens's recommendation, Defendants did not even have findings or conclusion of their own to adopt. Instead, after voting to reject the Hearing Officer's Findings and Conclusions, and announced that they would be revoking Ms. Boismier's teaching certificate, they directed their attorney to review the record, and post-hoc construct a report "that reflect[s] a decision to revoke the teaching certificate of Summer Boismier."

177. On August 22, 2024, a proposed order to revoke Ms. Boismier's teaching certificate was "presented for [Defendant SBE] to authorize the chair of the Board to sign off on it." It is not apparent from the minutes of the August 22, 2024, meeting whether the members of Defendant SBE in fact reviewed the proposed order ("Final Revocation Order").

178. Nevertheless, Defendants Burdick, Lepak, Quebedeaux, Wesson, Archer, and Walters voted unanimously to authorize the Board Chair (Superintendent Walters) to sign off on the Final Revocation Order.

179. When members of the media asked for a copy of the Final Revocation Order, Superintendent Walters's spokesperson directed them to file an open records request, declining to provide one voluntarily.[34]

---

[33] Nuria Martinez-Keel, *Oklahoma board rejects judge's advice to keep Summer Boismier's teaching license intact*, OKLAHOMA VOICE (June 27, 2024), https://oklahomavoice.com/2024/06/27/oklahoma-board-rejects-judges-advice-to-keep-summer-boismiers-teaching-license-intact/.

[34] Murray Evans & M. Scott Carter, *Ryan Walters, Ed Board ordered to disclose why former Norman teacher's license was revoked*, THE OKLAHOMAN (Sept. 6, 2024),

180. Defendants SDE, SBE, and Superintendent Walters also refused to give Ms. Boismier access to the Final Revocation Order.

181. The Final Revocation Order was released only once U.S. District Court Judge Charles Goodwin—who had enjoined enforcement of parts of HB 1775—ordered Superintendent Walters and SBE to produce the order revoking Ms. Boismier's license, so he could evaluate whether the decision relied on parts of HB 1775 that had been enjoined.

182. The Final Revocation Order finally became available to Ms. Boismier when Defendants filed it in federal court on September 9, 2024—over two months after the SBE and Superintendent Walters revoked Ms. Boismier's teaching certificate. (Ex. 2, Final Revocation Order).

183. The Final Revocation Order is signed by Superintendent Walters, but it is not dated. It is not clear when the document was created, when it was reviewed and approved by the other members of the SBE (if ever), or when it was executed by Superintendent Walters.

184. There was ample opportunity for Defendants to alter the Final Revocation Order after the *BERT* plaintiffs first raised concerns that Defendants relied on enjoined portions of HB 1775 when revoking Ms. Boismier's teaching certificate.

185. The Final Revocation Order is not an independent review of the evidence or analysis of the law. Instead, its author started with Hearing Officer Stevens's Findings of Fact, Conclusions of Law, and Recommendation, and made deletions and additions to support Defendants' pre-ordained, desired outcome.

---

https://www.oklahoman.com/story/news/courts/2024/09/06/ryan-walters-oklahoma-norman-teacher-license-summer-boismier/75104521007/.

186. The drafter of the Final Revocation Order made the following changes to Hearing Officer Stevens's Findings of Facts, without explaining the reasons for reversing the Hearing Officer's findings:

| **Description of Change** | **H.O. Stevens's Para. #** | **Final Revocation Para. #** |
|---|---|---|
| Deleting the sentence: "No corroborating evidence was presented about the specific political topics, legislation, or other subjects discussed in the classroom." | ¶ 8 | ¶ 9 |
| Inserting the phrase: "reverse psychology." | ¶ 11 | ¶ 12 |
| Deleting the phrase: "where students could apply for a free library card." | ¶ 12 | ¶ 13 |
| Deleting a description of the numerous uncontroversial books that students could access with a Brooklyn Public Library card. | ¶¶ 13–14 | ¶ 14 |
| Deleting the sentences: "Disputed evidence was offered that Respondent possessed a copy of *Gender Queer*. One witness testified she recalled seeing it, while Respondent denies having a copy of it . . . No corroborating evidence of its existence in the classroom, like a photograph, was introduced." | ¶ 15 | ¶ 15–16 |
| Deleting the sentence: "If a copy of *Gender Queer* did exist in Respondent's classroom library, it was covered from students' view with opaque paper with the rest of the classroom library books, per District guidelines." | ¶ 16 | ¶ 15–16 |
| Modifying a paragraph that previously read: "Applicant introduced evidence of Respondent vocally expressing her opposition to HB 1775 to the media; however, no evidence as provided as to whether Respondent specifically expressed opposition to HB 1775 in her classroom;"<br><br>To now read: "Boismier admitted the display with the QR code and written messages was a reaction to a state law known as HB 1775 that was enacted in May 2022 to limit what public schools could teach about race and gender . . . The display was intended to express opposition to HB 1775 in Boismier's classroom. *Id*. Boismier testified that she did not believe it was possible for her personally to teach in Oklahoma with HB 1775 in effect." | ¶ 18 | ¶ 17 |
| Deleting the paragraph: "No evidence was offered that Respondent used any of the identified books in student instruction." | ¶ 21 | ¶¶ 24–25 |

| | | |
|---|---|---|
| Modifying the paragraph that previously read: "No evidence was offered that any student accessed, attempted to access, or was provided with access to any of the identified books;"<br><br>To now read: "Appellant [sic] need not prove a student actually accessed a book on the District's list of prohibited books as a result of Boismier's posting of a QR code directing students to the Brooklyn Public Library's 'BKLYN Books UnBanned List.' Appellant [sic] need only prove Boismier intended to circumvent the District's prohibition of the subject books by directing her students, through the QR code, to the prohibited books. The overwhelming evidence proves Boismier's intent was to entice her students to read the electronic books on the prohibited books list in defiance of HHB 1775." | ¶ 23 | ¶ 24 |
| Deleting the paragraph: "No evidence was offered identifying any student who Respondent encouraged to read any of the identified books." | ¶ 24 | ¶¶ 24–25 |

187. Having altered the facts, the drafter of the Final Revocation Order then deleted nearly all of Hearing Officer Stevens's Conclusions of Law, without explaining why they were eliminating her analysis:

| **Description of Change** | **H.O. Stevens's Para. #** | **Final Revocation Para. #** |
|---|---|---|
| Deleting all analysis of what constitutes "Moral turpitude" under Oklahoma law. | ¶¶ 8–10 | ¶¶ 7–8 |
| Modifying the paragraph that previously read: "Based on the testimony and evidence presented, as reflected above in the Findings of Fact, Applicant has failed to prove by clear and convincing evidence that Respondent willfully committed an act of oral turpitude or has violated the Standards;"<br><br>To now read: "Based on the undisputed testimony and evidence presented, as reflected above in the Findings of Fact, the Board hereby modifies the proposed Findings and Conclusions of the hearing officer as permitted by OAC 210:1-5-6(g)(2) and renders the above findings of fact based exclusively on the evidence presented during the course of the hearing or | | |

| | | |
|---|---|---|
| previously filed briefs (made part of the record), of the testimony of witnesses taken under oath." | | |
| Deleting the paragraph that previously read: "Specifically, there was no evidence presented that Respondent used the three identified books - Gender Queer, Lawn Boy, or Stamped in class instruction or otherwise shared the books with students. Furthermore, the evidence showed that the QR code shared by Respondent linked to a library card application page, and there was no evidence presented that any of Respondent's students obtained a Brooklyn Public Library card or accessed any books through the Brooklyn Public Library." | ¶ 12 | ¶¶ 8–9 |
| Deleting all analysis of what constitutes race or sex discrimination. | ¶¶ 13–17 | ¶¶ 8–9 |
| Modifying the paragraph that previously read: "Based on the testimony and evidence presented, as reflected above in the in the Findings of Fact, Applicant has failed to prove by clear and convincing evidence that Respondent has willfully violated OAC § 210:10-1-23(a), OAC § 210:10-1-23(c)(4), or OAC § 210:10-1-23(c)(8);"<br><br>To now read: "Boismier willfully violated OAC 210:10-29-2, OAC 210:20-29-3, and OAC 210-20-29-4 by circumventing district policy and 70 O.S. § 24-157 (then HB 1775). Such violation supports that revocation of Boismier's teaching certificate." | ¶ 17 | ¶ 9 |
| Deleting the paragraph "Specifically, there was no evidence presented that Stamped was in Respondent's classroom, that Respondent used Stamped in class instruction or activity, or otherwise shared the book with students. Furthermore, the evidence showed that the QR code shared by Respondent linked to a library card application page, and there was no evidence presented that any of Respondent's students obtained a Brooklyn Public Library card or accessed any books through the Brooklyn Public Library." | ¶ 18 | ¶ 9 |

188. The result of these modifications was to flip the Hearing Officer's Findings of Facts and Conclusions of Law on their head, without explanation or basis.

189. Having deleted the unhelpful findings and conclusions, the Final Revocation Order concluded by asserting that Ms. Boismier "willfully violated OAC 210:10-29-2, OAC 210:20-29-3, and OAC 210:20-29-4 by circumventing district policy and 70 O.S. §24-157 (then HB 1775). Such violation supports revocation of Boismier's teaching certificate."

190. Comparing the facts to the cited regulations reveals that the Final Revocation Order's conclusions are untenable. To start, OAC 210:10-29-2 does not exist. If the Final Revocation Order meant to refer to OAC 210:20-29-2, that rule is a mere mission statement, which states that "In recognition of the magnitude of the responsibility inherent in the teaching process and by virtue of the desire for the respect and confidence of their colleagues, students, parents, and the community, teachers are to be guided in their conduct by their commitment to their students and their profession."

191. There was no clear and convincing evidence that Ms. Boismier violated this mission statement.

192. As for OAC 210:20-29-3, the Application for Revocation made clear that SDE's claims were based on OAC 210:20-29-3(b)(4) specifically,[35] which states that teachers "[s]hall make reasonable effort to protect the student from conditions harmful to learning or to health and safety."

193. There was no evidence, let alone clear and convincing evidence, that Ms. Boismier failed to protect her students from conditions that were harmful to learning, health, or safety. The words "health," "safety," and "learning," to do even appear in the Hearing Transcript.

[35] SDE can justify its revocation only if its Application for Revocation identified the specific statute or regulation that was allegedly breached, and it provides evidence that that specific statute or regulation was allegedly breached. Since SDE decided to rely on OAC 210:20-29-3(b)(4) specifically, it cannot now justify its decisions by pointing to other, unlisted portions of OAC 210:20-29-3.

194. Finally, as for OAC 210:20-29-4, the Application for Revocation did not even mention this section, so SDE cannot now base its decision to revoke Ms. Boismier's teaching certificate on an alleged breach of this section.

195. Even if the Application for Revocation had mentioned this section, it would fall short because it is irrelevant to Ms. Boismier's case. Section 29-4 says teachers shall not lie on an application, misrepresent their qualifications, help an unqualified person get into the profession, disclose certain information, lie about colleagues, or accept improper gifts. Whatever SDE thinks of Ms. Boismier, there's no allegation that she made a mistake on her application, misrepresented her qualifications, helped an unqualified person secure a teaching job, or accepted unlawful gifts.

196. SDE abandoned the claims it originally raised in Count Two of the Application for Revocation, which were based on OAC 210:10-1-23(a), 210:10-1-23(c)(4), 210:10-1-23(c)(8). Indeed, those sections were not even mentioned in the Final Revocation Order.

197. At bottom, there was no clear and convincing evidence that Ms. Boismier violated any state law, rule, or regulation—much less any law, rule, or regulation cited in the Application for Revocation.

198. The decision to revoke her license is unsustainable.

## XIV. Judge Goodwin of the Western District of Oklahoma Orders the State to Explain Whether it Relied on the Enjoined Portions of HB 1775 When Revoking Ms. Boismier's License.

199. On June 14, 2024, Judge Goodwin of the Western District of Oklahoma enjoined portions of HB 1775, holding those portions were unconstitutionally vague. *BERT v. Drummond*, 5:21-cv-01022-G (W.D. Okla. 2024).

200. Specifically, Judge Goodwin enjoined enforcement of:

a. the provision: "Any orientation or requirement that presents any form of race or sex stereotyping or a bias on the basis of race or sex is prohibited." Okla. Stat. tit. 70, § 24-157(A)(1);

b. the word "require" in the introductory verb clause in title 70, section 24-157(B)(1) of the Oklahoma Statutes;

c. subsections (c) and (d) of title 70, section 24-157(B)(1) of the Oklahoma Statutes, in their entireties; or

d. the Implementing Rules, to the extent they are inconsistent with this Order.

201. On September 12, 2024, the *BERT* court therefore ordered the state defendants to explain whether the state relied on the enjoined portions of HB 1775 when revoking Ms. Boismier's certificate.

202. The state defendants filed a response to that order, citing a footnote in the Final Revocation Order that stated that "[n]othing in this order is intended to rely on provisions of 70 O.S. § 24-157 (HB 1775) that are subject to or contrary to the Order on Preliminary Injunction issued [by this Court]."

203. But just stating it does not make it true.

204. On at least two occasions, Defendants recognized that they were relying on enjoined portions of HB 1775 to revoke Ms. Boismier's license.

205. First, the Application for Revocation claimed that Ms. Boismier violated certain implementing regulations of HB 1775, which prohibit instruction that "[m]embers of one race or sex cannot and should not attempt to treat others without respect to race or sex."

206. That regulation's language is identical to 70 O.S. § 24-157(B)(1)(d), and Defendant SDE admits that this regulation "w[as] the Board's required implementation of HB 1775 (2021)."

207. But Judge Goodwin enjoined both 70 O.S. § 24-157(B)(1)(d) and its "Implementing Rules."

208. Defendants therefore violated Judge Goodwin's Order of Preliminary Injunction by relying on enjoined portions of HB 1775 and its implementing regulations to justify stripping Ms. Boismier's teaching certificate.

209. Second, the Final Revocation Order states that Ms. Boismier's license was revoked because the state defendants found that she violated "OAC 210:10-29-2, OAC 210:20-29-3, and OAC 210:20-29-4 by circumventing district policy and 70 O.S. §24-157 (then HB 1775)."

210. Although the Final Revocation Order does not clarify which portions of HB 1775 the government was relying on, it clearly relied on the enjoined portions of HB 1775 (i.e., 70 O.S. § 24-157(B)(1)(d)), because that is the portion of HB 1775 that Defendant SDE referenced in its Application for Revocation.

## XV. By Revoking her Teaching License, Defendants Strip Ms. Boismier of Her Livelihood.

211. Because Defendants revoked her teaching license, Ms. Boismier cannot teach secondary school in the state of Oklahoma.

212. Revoking Ms. Boismier's license also stripped her ability to secure employment in other states.

213. Other states permit educators to waive-in to their licensure regime if they have an Oklahoma license, for example Colorado or New York State.

214. However, Ms. Boismier was unable to pursue this pathway to licensure when she was living in Brooklyn, because Defendants had stripped her of her Oklahoma teaching certificate.

215. If an applicant is not waiving into the system, she has to complete the certification process from scratch, which is more time-consuming and costly than waiving in.

216. Moreover, states ask teaching applicants whether they have ever had an out-of-state teaching license revoked, and those states will often not grant licenses to applicants who have had their license revoked by another state.

217. Ms. Boismier was thus unable to pursue this pathway to licensure when she was living in Brooklyn, because Defendants had stripped her of her Oklahoma teaching certificate.

218. Because Ms. Boismier has been unable to secure a teaching certificate in New York (or any other state) since Oklahoma revoked her license, she has been forced to pursue work in fields other than her profession.

219. Despite submitting over 300 applications, Ms. Boismier has not been able to secure full-time employment.

220. Effectively, Defendants destroyed Ms. Boismier's career and extinguished her right to earn a livelihood, leaving her destitute.

## XVI. Defendants Retaliate Against Other Political Dissidents.

221. Defendants punished Ms. Boismier's protected speech and opposition to discrimination in the hopes of making an example out of her, but she was not their only target.

222. Instead, Superintendent Walters doubled down, insisting that he would strip the teaching certificate of anyone who engaged in similar speech.

223. During Superintendent Walters's tenure, the State Board of Education revoked or suspended upwards of twenty license "for various reasons, including classroom scandals and political speech online,"—a decision Defendant SBE is now undoing because Superintendent Walters has departed and there was no lawful basis for the revocation in the first place.[36]

---

[36] Meghan Mosley, *Oklahoma teacher certificates reinstated amid new State Department of Education leadership*, KOCO (Oct. 13, 2025), https://www.koco.com/article/oklahoma-teacher-certificates-reinstated-amid-new-state-department-of-education-leadership/69021681.

224. Recognizing that Defendants were wielding their authority to revoke teaching certificates with retaliatory intent and caprice, the Oklahoma Legislature voted to limit their ability to strip teaching certificates.[37]

225. After Defendants revoked Ms. Boismier's teaching license, the Oklahoma Legislature passed HB 1277,[38] which would permit the Superintendent to revoke a teaching license only if the teaching committed the following offenses:

a. Willful violation of any federal or state law;

b. The abuse or neglect of a child;

c. Moral turpitude, which is not defined; or

d. A conviction for certain crimes.

226. HB 1277 was designed to prohibit the Superintendent from abusing his power for a retaliatory or otherwise improper purpose, including exploiting ambiguity in the Department's own regulations, which previously permitted the Superintendent to revoke teaching certificates for any "proper cause." [39]

227. HB 1277 became law on May 29, 2025.[40]

228. Despite attempts by the Oklahoma Legislature to rein him in, Superintendent Walters's content-restrictive policies only got bolder.

---

[37] Alexia Aston, *Lawmakers vote to limit Ryan Walters' ability to revoke teaching licenses as more suspensions loom*, The Oklahoman (May 22, 2025), https://www.oklahoman.com/story/news/education/2025/05/21/ryan-walters-oklahoma-teaching-licenses-gov-stitt-hb-1277/83747464007/.
[38] HB 1277 (2025), https://www.oklegislature.gov/cf_pdf/2025-26%20ENR/hB/HB1277%20ENR.PDF, (last visited Aug. 29, 2025).
[39] OAC § 210-1-5-6(b).
[40] OK HB 1277, LEGISCAN, https://legiscan.com/OK/bill/HB1277/2025, (last visited Aug. 29, 2025).

229. Superintendent Walters announced that he—with or without the SBE's approval—was going to require all teachers coming from California and New York to pass an ideological purity test, ensuring they don't subscribe to "woke" ideologies.[41]

230. Imposing these sorts of tests on teachers from New York and California, but not on teachers from Oklahoma, violates the Privileges and Immunities Clause.[42] Regardless of which state a teacher is from, the First Amendment prohibits states from refusing to employ teachers because they hold different beliefs.[43]

231. On September 5, 2025, Defendant State Department of Education expanded the group of teachers who were forced to take the test to include those from Washington and Oregon. Defendant SDE further caused the testing site to go live.[44]

232. The test is administered online via "PragerU," which is an organization that creates short videos and other supplemental tools, ostensibly to be used in education—it is not a degree-granting university.

[41] Murray Evans, *New details emerge about Ryan Walters' 'woke' test for teachers from California*, New York, THE OKLAHOMAN (Aug. 16, 2025), https://www.oklahoman.com/story/news/education/2025/08/16/ryan-walters-oklahoma-woke-test-for-teachers-questions/85681597007/.

[42] *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 280 (1985) ([T]his Court repeatedly has found that 'one of the privileges which the Clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State.'" (quoting *Toomer v. Witsell*, 334 U.S., at 385, 396 (1948))).

[43] *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829–830 (1995) (explaining that viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional").

[44] Murray Evans, *Oklahoma expands reach of Ryan Walters' controversial 'woke' test, despite legal restrictions*, THE OKLAHOMAN (Sept. 5, 2025), https://www.oklahoman.com/story/news/education/2025/09/05/ryan-walters-oklahoma-woke-test-expansion-legal-restrictions/85983431007/.

233. PragerU has been critiqued by education historians as presenting videos that "pretend that they are simply factual" but in fact have a "very distinct perspective," that consistently skews one ideological way.[45]

234. In one video, a cartoon depiction of Frederick Douglass taught that "there was no real movement to abolish slavery anywhere in the world before the American founding. Slavery was part of life all over the world. It was America that began the conversation to end it." This video ignored the fact that the U.S. was one of the last Western countries to abolish slavery.[46] In another PragerU video, a cartoon depiction of Christpher Columbus told children that they are "estupido" for judging his pro-slavery views.

235. PragerU's test required applicants to choose Defendant SDE's preferred answer before advancing—meaning test takers were forced to agree with the Defendant SDE to complete and pass the test.

236. The test included the following questions and required answers in bold.

237. Question 4: Which chromosome pair determines biological sex in humans?

a. AA/BB

**b. XX/XY**

c. RH/AB

d. XE/XQ

---

[45] *Why critics are alarmed about the influence of PragerU's educational videos*, PBS NEWS (Sept. 15, 2025), https://www.pbs.org/newshour/show/why-critics-are-alarmed-about-the-influence-of-pragerus-educational-videos.
[46] *Id.*

238. Defendant SDE's preferred answer to question 4 is wrong. Human beings can contain a multitude of chromosomal pairs, including XXY, XXX, XYY, XXYY, XXXY, XXXX, XXXXY, XXXXX.[47]

239. Question 5: Why is the distinction between male and female considered important in areas like sports and privacy?

a. For equity in minority communities

**b. To preserve fairness, safety, and integrity for both sexes**

c. To increase participation in sports

d. To enhance the self-esteem of transgender children

240. Question 26: What was Abraham Lincoln's primary reason for waging the Civil War?

a. To preserve states' rights

b. To abolish slavery

**c. To preserve the Union**

d. To end the Union

241. The answers to Questions 5 and 26 are subject to debate, and not susceptible to a "correct" answer. Questions about values such as "fairness" and "integrity" cannot be resolved as a matter of fact. Nor can questions about President Lincoln's primary motivation, especially when scholars debate the complex origins of our Civil War and that abolishing slavery was a significant consequence.

242. These questions all essentially demanded that the reader adopt Defendant SDE's viewpoint on matters of opinion on which reasonable minds can differ and often do.

---

[47] *About X and Y Variations*, GENETIC.ORG, https://genetic.org/variations/ (last visited September 6, 2025).

243. The test's sole purpose is to force the taker to adopt Defendant SDE's viewpoints. The First and Fourteenth Amendments forbid the government from imposing these sorts of belief tests on the people.

244. This test was not an aberration. In fact, eliminating the civil rights of every teacher and student under their domain became the express goal of Superintendent Walters and the State Department of Education.

245. On January 17, 2025, the SDE held a hearing for proposed changes to their rules.

246. In that meeting, the SDE considered whether to entirely eliminate OAC 210:1-3-5, which previously protected students' civil rights:

**210:1-3-5. Civil Rights [REVOKED]**
~~(a) The State Board believes it is essential for the education process to include cultural awareness and sensitivity for a school age population which reflects diverse backgrounds, races, cultures and attitudes. [70-1210.201]~~
~~(b) In relation to women's equity, the State Board of Education policy is one expressing support and commitment to increasing the number of women in educational administration in the public schools of Oklahoma, prohibiting discrimination on the basis of sex in education programs and activities under its supervision, and providing technical assistance and staff improvement activities for state and local education agency staffs to comply with desegregation and affirmative action requirements. Furthermore, as stated in the Affirmative Action Plan, the State Board of Education does not discriminate on the basis of race, color, national origin, sex, age, religion, handicap, or status as a veteran in the employment of personnel, provision of services, use of facilities, organization of group activities, and other similar benefits in any of its programs, policies or practices. It further assures that no new commitments for federal financial assistance under such programs will be made to school districts unless an assurance of compliance, a court order, or a plan of desegregation has been filed.~~
~~(c) The compliance documents enumerate methods of administration to assure compliance and list procedures for evaluating and handling complaints filed with the Board.~~

*Elimination of SDE's Policy on Civil Rights, as Displayed on SDE's Website*[48]

247. Ms. Boismier was one of the first victims of the campaign of indoctrination being waged by Defendants—but she is not their only victim. Already, teachers and schools are self-censoring, fearing that they'll also lose their ability to educate students if they say anything Defendants disagree with. Those teachers who would still like to serve Oklahoma were forced to

---

[48] *Proposed Changes to SDE Policy*, OKLAHOMA STATE DEPARTMENT OF EDUCATION, https://oklahoma.gov/content/dam/ok/en/osde/documents/services/legal-services/administrative-rules/2025/2025%20210%20Chapter%201.pdf (last visited Aug. 29, 2025).

take a loyalty test before they could receive accreditation. And the state government wholesale eliminated protections for "civil rights" from its regulatory code.

248. To preserve her own rights, and the rights of educators, students, and caregivers that are under attack by the very government that swore to serve them, Ms. Boismier brings the following claims for relief.

## CLAIMS ONE, TWO, AND THREE FOR RELIEF

### Discrimination, Retaliation, and Anticipatory Retaliation on the Basis of Sex in Violation of the Equal Protection Clause, Brought Through 42 U.S.C. § 1983 (Against All Defendants)

249. Ms. Boismier hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

250. At all times relevant to this claim, Defendants were acting under color of state law.

251. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution protects individuals who oppose discriminatory practices against, advocate on behalf of, and associate with protected classes. Likewise, the Equal Protection Clause protects individuals who make it reasonably apparent that they will continue to engage in such protected activities.

252. The Equal Protection Clause recognizes sex as a protected class. With respect to sex, the Supreme Court in *Bostock v. Clayton County, Georgia* held that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex . . . ." 590 U.S. 644, 679 (2020); *Tudor v. S.E. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021).

253. At all times relevant to this claim, Ms. Boismier enjoyed federal rights to oppose discriminatory practices against protected LGBTQ+ individuals; associate with protected classes; advocate on behalf of protected classes; and made it reasonably apparent that she had engaged in such protected conduct or would do so in the future.

254. As alleged herein, Defendants State Department of Education, State Board of Education, the Superintendent of Public Instruction, and Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson violated these protections three times over when they (1) discriminated against, (2) retaliated against, and (3) engaged in anticipatory retaliation against Ms. Boismier because of her opposition to sex-based discriminatory practices, her association with and advocacy on behalf of such protected classes, and the expectation that she would continue engaging in such protected activities in the future.

255. As alleged herein Defendants were an affirmative link and a causal connection to their threefold violations of (1) discrimination, (2) retaliation, and (3) anticipatory retaliation carried out by the above-listed final policymakers.

256. Defendants State Department of Education, State Board of Education, the Superintendent of Public Instruction, and Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson had control of teacher certificates for teachers in the State of Oklahoma and intentionally exercised that control to (1) discriminate (2) retaliate, and (3) anticipatorily retaliate against Ms. Boismier.

257. At all times relevant to this claim, it was clearly established that public officials could not deny a person's right to equal protection under the laws of the United States by (1) discriminating, (2) retaliating, and (3) anticipatorily retaliating against them the basis of their sex-based opposition, advocacy, and association. Any reasonable public official acting under color of state law knew or should have known of these clearly established rights.

258. Among other acts of (1) discrimination, (2) retaliation, and (3) anticipatory retaliation alleged herein, Defendants were antagonistic towards Ms. Boismier and her protected

activities, encouraged others to be so as well, and ultimately revoked Ms. Boismier's teaching certificate.

259. Defendants' discriminatory animus towards LGBTQ+ community members and Ms. Boismier's protected activities were the but-for cause of Defendants' discrimination and retaliation.

260. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Boismier's federally protected rights.

261. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## CLAIMS FOUR, FIVE, AND SIX FOR RELIEF

### Discrimination, Retaliation, and Anticipatory Retaliation on the Basis of Race in Violation of the Equal Protection Clause and 42 U.S.C. § 1981, Brought Through 42 U.S.C. § 1983 (Against All Defendants)

262. Ms. Boismier hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

263. At all times relevant to this claim, Defendants were acting under color of state law.

264. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution protects individuals who oppose discriminatory practices against, advocate on behalf of, and associate with protected classes. Likewise, the Equal Protection Clause protects individuals who make it reasonably apparent that they will continue to engage in such protected activities.

265. The Equal Protection Clause recognizes race as a protected class.

266. At all times relevant to this claim, Ms. Boismier enjoyed federal rights to oppose discriminatory practices against racial minorities; associate with protected classes; advocate on

behalf of protected classes; and made it reasonably apparent that she had engaged in such protected conduct or would do so in the future.

267. As alleged herein, Defendants (1) discriminated against, (2) retaliated against, and (3) engaged in anticipatory retaliation against Ms. Boismier because of her opposition to race-based discriminatory practices, her association with and advocacy on behalf of such protected classes, and the expectation that she would continue engaging in such protected activities in the future.

268. As alleged herein Defendants State Department of Education, State Board of Education, the Superintendent of Public Instruction, and Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson were an affirmative link and a causal connection to the discrimination, retaliation, and anticipatory retaliation carried out by the above-listed final policymakers.

269. Defendants State Department of Education, State Board of Education, the Superintendent of Public Instruction, and Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson had control of teacher certificates for teachers in the State of Oklahoma and intentionally exercised that control to (1) discriminate, (2) retaliate, and (3) anticipatorily retaliate against Ms. Boismier.

270. At all times relevant to this claim, it was clearly established that public officials could not deny a person’s right to equal protection under the laws of the United States by (1) discriminating, (2) retaliating, or (3) anticipatorily retaliating against them the basis of their race-based opposition, advocacy, and association. Any reasonable public official acting under color of state law knew or should have known of these clearly established rights.

271. Among other acts of (1) discrimination, (2) retaliation, and (3) anticipatory retaliation alleged herein, Defendants State Department of Education, State Board of Education, the Superintendent of Public Instruction, and Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson were antagonistic towards Ms. Boismier and her protected activities, encouraged others to be so as well, and ultimately revoked Ms. Boismier's teaching certificate.

272. Defendants' discriminatory animus towards racial minorities and Ms. Boismier's protected activities were the but-for cause of Defendants' (1) discrimination, (2) retaliation, and (3) anticipatory retaliation.

273. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Boismier's federally protected rights.

274. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## CLAIM SEVEN FOR RELIEF

### Conspiracy under the Ku Klux Klan Act in Violation of 42 U.S.C. § 1985(3) (Against All Individual Defendants)

275. Ms. Boismier hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

276. Although not necessary for a Section 1985 claim, at all times relevant to this claim, Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson were acting under color of state law when they conspired to revoke her teaching certificate.

277. Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson conspired with each other to revoke Ms. Boismier's teaching certificate because she advocated on behalf of members of the LGBTQ+ community.

278. Section 1985(3) prohibits when "two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws[.]"

279. Ms. Boismier brings this claim under both the "deprivation" clause and the "hindrance clause" of Section 1985(3) in that Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson conspired both to deprive a person or class of persons equal privileges and protection of the law as described above and conspired for the purpose of preventing or hindering Ms. Boismier from securing the same to all persons within the state.

280. At all times relevant to this claim, Ms. Boismier enjoyed those rights previously alleged, including the rights to equal protection under the laws of the United States and the rights to oppose discriminatory practices, advocate and associate with LGBTQ+ community members, and to engage in protected speech pursuant to the First Amendment.

281. As alleged herein, Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson plotted, coordinated, and executed a common plan with each other to engage in discrimination, retaliation, obstruction, intimidation, and threats against LGBTQ+ community members, and Ms. Boismier by association and advocacy for them, in violation of Ms. Boismier's rights and those of others in their community.

282. As alleged herein, in furtherance of their conspiracy to deprive Ms. Boismier and others of equal protection or equal privileges and immunities under the Fourteenth Amendment, Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson acted on class-based animus and engaged in acts of intimidation, threats, discrimination, and retaliation.

283. The illegal activities described above were undertaken by Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson as overt acts pursuant to an unlawful conspiracy, the purpose of which was to both hinder Ms. Boismier in giving or securing to all persons equal protection of the laws, and to oppress, harass, and stigmatize LGBTQ+ community members in violation of the Fourteenth Amendment, and through them Ms. Boismier, in violation of the rights guaranteed by the Constitution and laws of the United States.

284. The conspiracy was motivated by a class-based invidious discriminatory animus.

285. The conspiracy was aimed at interfering with rights that by definition are protected against private, as well as official, encroachment.

286. The illegal activities described above were undertaken by Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson in furtherance of their personal animus towards LGBTQ+ community members.

287. At all times relevant to this claim, it was clearly established that public officials could not engage in conspiracies to deprive public employees of these rights. Any reasonable public official acting under color of state law knew or should have known that such conspiracies were clearly unlawful.

288. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## CLAIM EIGHT FOR RELIEF

### Retaliation against Protected Speech in Violation of the First Amendment, Brought Through 42 U.S.C. § 1983 (Against All Defendants)

289. Ms. Boismier hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

290. At all times relevant to this claim, Defendants were acting under color of state law.

291. At all times relevant to this claim, Ms. Boismier enjoyed the First Amendment rights to engage in speech on matters of public concern in her personal capacity, and be free from state action that deters, and chills protected speech.

292. At all times relevant to this claim, Ms. Boismier was entitled to oppose unconstitutional censorship and discrimination, without reprisal.

293. As alleged herein, Ms. Boismier opposed, spoke out against, and refused to comply with unlawful and unconstitutional censorship, both in private and publicly.

294. Ms. Boismier posted multiple times on her personal twitter page, explaining how HB 1775 is stripping students' access to "books by BIPOC, LGBTQ+, and/or gender non-conforming authors because state leadership has spent the last year loudly labeling these books and their stories/perspectives as pornography, as indoctrination."

295. Ms. Boismier appeared in multiple televised interviews to criticize the legislature, governor, and Defendants, and explain that teachers are scared to teach in light of HB 1775.

296. Ms. Boismier responded to The Oklahoman's request for quote, and urged people to vote Superintendent Walters out of office.

297. Ms. Boismier appeared in an interview with the Brooklyn Public Library to criticize HB 1775 and Superintendent Walters specifically, pointing out that he made false statements about her.

298. Ms. Boismier filed a defamation claim against Defendant Walters based on him falsely claiming that she was fired from her job at NPS.

299. As alleged herein, Defendants State Department of Education, State Board of Education, the Superintendent of Public Instruction, and Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson had final policymaking authority on whether to revoke Ms. Boismier's teaching certificate when they violated these protections by retaliating and/or anticipatorily retaliating against Ms. Boismier, intending to chill and deter her protected speech.

300. As alleged herein, Defendants were an affirmative link and a causal connection to the retaliation and/or anticipatory retaliation carried out by the above-listed final policymakers.

301. Defendants State Department of Education, State Board of Education, the Superintendent of Public Instruction, and Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson had control of teaching certificates in Oklahoma and exercised that control to retaliate and/or anticipatorily retaliate against Ms. Boismier.

302. Specifically, Defendants engaged in viewpoint discrimination and retaliation. That is, they engaged in censorship based on their disagreement with the *content* and *viewpoint* of Ms. Boismier's protected speech. Viewpoint discrimination is presumptively unconstitutional and subject to strict scrutiny.

303. At all times relevant to this claim, it was clearly established that public officials could not retaliate against those who engage in protected speech because of disagreements with

their viewpoints. Any public official acting under color of state law knew or should have known of these clearly established rights.

304. Among other acts of retaliation and/or anticipatory retaliation alleged herein, Defendants were antagonistic towards Ms. Boismier and her protected activities, encouraged others to be so as well, and ultimately revoked Ms. Boismier's teaching certificate.

305. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Boismier's federally protected rights.

306. The value of Ms. Boismier's speech outweighed any legitimate governmental interest. Indeed, Defendants' retaliation against Ms. Boismier was intentional, vexatious, willful and wanton, in total disregard for her rights, and not in furtherance of any legitimate governmental interest. Defendants' non-discriminatory and non-retaliatory reasons for their conduct are pretextual.

307. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## CLAIM NINE FOR RELIEF

### Retaliation against Association in Violation of the First Amendment, Brought Through 42 U.S.C. § 1983 (Against All Defendants)

308. Ms. Boismier hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

309. At all times relevant to this claim, Defendants were acting under color of state law.

310. At all times relevant to this claim, Ms. Boismier enjoyed the First Amendment rights to be free from state action that punishes, deters, or chills free association.

311. "The First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance." *Vogt v. McIntosh Cnty., Okla. Bd. of County Comm'rs*, 98 F.4th 1013, 1014 (10th Cir. 2024).

312. At all times relevant to this claim, Ms. Boismier was entitled to associate freely and hold her own political beliefs without reprisal.

313. As alleged herein, Ms. Boismier held beliefs, particular those on the rights of LGBTQ+ people and racial minorities, that differed from those of Defendants.

314. As alleged herein, Defendants State Department of Education, State Board of Education, the Superintendent of Public Instruction, and Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson had final policymaking authority on whether to revoke Ms. Boismier's teaching certificate when they violated these protections by retaliating and/or anticipatorily retaliating against Ms. Boismier, intending to chill and deter her protected association and beliefs.

315. As alleged herein, Defendants were an affirmative link and a causal connection to the retaliation and/or anticipatory retaliation carried out by the above-listed final policymakers.

316. Defendants State Department of Education, State Board of Education, the Superintendent of Public Instruction, and Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson had control of teaching certificates in Oklahoma and exercised that control to retaliate and/or anticipatorily retaliate against Ms. Boismier.

317. Specifically, Defendants engaged in discrimination and retaliation, that is, they engaged in censorship based on their disagreement with the content and viewpoint of Ms.

Boismier's beliefs. Viewpoint discrimination is presumptively unconstitutional and subject to strict scrutiny.

318. At all times relevant to this claim, it was clearly established that public officials could not retaliate against those who exercised their right to freedom of belief and association because of disagreements with their viewpoints. Any public official acting under color of state law knew or should have known of these clearly established rights.

319. Among other acts of retaliation and/or anticipatory retaliation alleged herein, Defendants were antagonistic towards Ms. Boismier and her protected activities, encouraged others to be so as well, and ultimately revoked Ms. Boismier's teaching certificate.

320. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Boismier's federally protected rights.

321. The value of Ms. Boismier's association and viewpoints outweighed any legitimate governmental interest. Indeed, Defendants' retaliation against Ms. Boismier was intentional, vexatious, willful and wanton, in total disregard for her rights, and not in furtherance of any legitimate governmental interest. Defendants' non-discriminatory and non-retaliatory reasons for their conduct are pretextual.

322. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## CLAIM TEN FOR RELIEF

**Violations of the First Amendment Establishment Clause,**
**Brought Through 42 U.S.C. § 1983**
**Government Endorsement and/or Favoring of One Religion**
**Over Other Religions or Non-Religion**
**(Against All Defendants)**

323. Ms. Boismier hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

324. At all times relevant to this claim, Defendants were acting under color of state law.

325. The Establishment Clause prohibits the government from taking actions that endorse, advance, or impose religious doctrine, show preference for any particular religion or religious beliefs in general.

326. Specifically, the Establishment Clause prohibits any practice that "make[s] a religious observance compulsory." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537 (2022) (quotations omitted). Such as when school broadcasts prayers over a public address system at a football game. *Id*. at 542. This impermissible coercion is especially present when a government entity imposes discipline on those who don't participate in the religious practices being imposed by the government. *Cf. id*. (discussing how coercion was less likely when students were not punished for forgoing an invitation to pray).

327. Government provided benefits, including access to public school resources, cannot be conditioned on someone sharing, or participating in, the government's preferred religion. *Id*.

328. Teaching certificates, and the right to pursue a career as a public employee, must comply with the Establishment Clause.

329. Defendants acted to limit or revoke teaching licenses in a way that that endorsed, advances, or favored one particular limited religious ideology, specifically a narrow and sectarian interpretation of Christianity, over other Christian denominations, other religions and other religious beliefs, and non-religious perspectives.

330. As alleged herein, Defendants sought to compel all teachers to censor or exclude content, including LGBTQ+ content, based on the belief that such material was inconsistent with their preferred religious doctrine.

331. When Ms. Boismier refused to adopt or enforce viewpoint-based censorship policies grounded in Defendants' religious ideology, Defendants revoked her teaching certificate in order to impose their religiously motivated agenda on Oklahoma public schools.

332. These actions were taken to ensure that public school teachers and curriculum aligned with and promoted Defendants' preferred religious beliefs, to the exclusion of others, in violation of the First Amendment.

333. At all times relevant to this claim, Ms. Boismier had a constitutional right to oppose government actions that improperly endorsed, advanced, or imposed religious doctrine in a public institution.

334. At all times relevant to this claim, it was clearly established that the government may not favor one religion, religious sect, or religious viewpoint over others, or over non-religion, when administering public services, including teaching licenses.

335. Defendants revoked Ms. Boismier's teaching certificate in order to remove an impediment to their efforts to implement religiously motivated censorship in Oklahoma public schools.

336. Defendants' actions violated the Establishment Clause of the First Amendment.

337. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Boismier's federally protected rights.

338. The value of Ms. Boismier's rights under the Establishment Clause outweighed any legitimate governmental interest. Indeed, Defendants' violation of the Establishment Clause was

intentional, in reckless or callous disregard for Ms. Boismier's federally protected rights, and not in furtherance of any legitimate governmental interest. *See Epperson v. State of Ark.*, 393 U.S. 97, 107 (1968) ("[T]he state has no legitimate interest in protecting any or all religions from views distasteful to them" (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 505 (1952))).

339. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## CLAIM ELEVEN FOR RELIEF

### Violations of the First Amendment Right to Freedom of Belief, Brought Through 42 U.S.C. § 1983 (Against All Defendants)

340. Ms. Boismier hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

341. The First Amendment to the United States Constitution protects the freedom of belief. *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id*.

> [I]n view of the nature of the teacher's relation to the effective exercise of the rights which are safeguarded by the Bill of Rights and by the Fourteenth Amendment, inhibition of freedom of thought, and of action upon thought, in the case of teachers brings the safeguards of those amendments vividly into operation. Such unwarranted inhibition upon the free spirit of teachers […] has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice; it makes for caution and timidity in their associations by potential teachers. *Id*. (internal quotations omitted).

342. "Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate." *Id*. (internal quotations omitted).

343. Government provided benefits, including access to public school resources, cannot be conditioned on someone sharing, or participating in, the government's preferred beliefs.

344. Teaching certificates, and the right to pursue a career as a public employee, must comply with the First Amendment.

345. Defendants acted to limit or revoke teaching licenses in a way that that endorsed, advances, or favored one particular limited ideology, specifically a narrow and sectarian interpretation of Christianity, over other Christian denominations, other religions and other religious beliefs, and non-religious perspectives.

346. As alleged herein, Defendants sought to punish teachers for not holding their same beliefs towards members of the LGBTQ+ community and racial minorities.

347. When Ms. Boismier refused to adopt or enforce viewpoint-based censorship policies grounded in Defendants' ideology, Defendants revoked her teaching certificate in order to punish Ms. Boismier for not sharing their personal beliefs towards members of the LGBTQ+ community and racial minorities.

348. These actions were taken to ensure that public school teachers and curriculum aligned with and promoted Defendants' preferred beliefs toward members of the LGBTQ+ community and racial minorities, to the exclusion of others, in violation of the First Amendment.

349. At all times relevant to this claim, Ms. Boismier had a constitutional right to oppose government actions that improperly endorsed, advanced, or imposed belief-based restrictions in a public institution.

350. At all times relevant to this claim, it was clearly established that the government may not punish teachers for holding different beliefs towards members of the LGBTQ+ community and racial minorities when administering public services, including teaching licenses.

351. Defendants revoked Ms. Boismier's teaching certificate in order to remove an impediment to their efforts to implement censorship of beliefs in Oklahoma public schools.

352. Defendants' actions violated the First Amendment.

353. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Boismier's federally protected rights.

354. The value of Ms. Boismier's rights under the First Amendment outweighed any legitimate governmental interest. Indeed, Defendants' violation of the First Amendment was intentional, in reckless or callous disregard for Ms. Boismier's federally protected rights, and not in furtherance of any legitimate governmental interest. *See Shelton*, 364 U.S. at 487–90.

355. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## CLAIM TWELVE FOR RELIEF

### Violations of the Due Process Clause, Brought Through 42 U.S.C. § 1983 (Against All Defendants)

356. Ms. Boismier hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

357. The Procedural Due Process Clause of the Fourteenth Amendment guaranteed Ms. Boismier "notice and an opportunity to be heard." *Roberts v. Winder*, 16 F.4th 1367, 1380 (10th Cir. 2021).

358. Defendants violated this fundamental right by (1) revoking the neutral Hearing Officer's findings and conclusions without basis, (2) voting to revoke Ms. Boismier's teaching certificate based on their own animus rather than the evidence in the record, (3) adopting findings and conclusions that were not based on the record, (4) as basis for the revocation, claiming Ms.

Boismier violated provisions of law that do not exists, or that did not appear in Ms. Boismier's notice, and (5) as basis for the revocation, relying on portions of HB 1775 and its implementing regulations that were enjoined by Judge Goodwin.

359. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## CLAIM THIRTEEN FOR RELIEF

**Violations of Art. 2, Sec. 5 of the Oklahoma Constitution**
**Expenditure of Public Funds on Religious Enterprises**
**(Against Defendants State Department of Education, State Board of Education, and Superintendent of Public Instruction)**

360. Ms. Boismier hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

361. Article 2, Section 5 of the Oklahoma Constitution states "No public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion, or for the use, benefit, or support of any priest, preacher, minister, or other religious teacher or dignitary, or sectarian institution as such."

362. Even if public funds are not expended, this clause forbids the government from using public land to "for the use, benefit or support of a sect of system of religion." *Drummond ex rel. State of Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1, *8 (Okla. 2024).

363. "The plain intent of Article 2, Section 5 is to ban State Government, its officials, and its subdivisions from using public money or property for the benefit of any religious purpose. Use of the words 'no,' 'ever,' and 'any' reflects the broad and expansive reach of the ban." *Shaw v. Grumbine*, 278 P. 311, 315 (Okla. 1929).

364. Defendants State Department of Education, State Board of Education, and Superintendent of Public Instruction initiated the revocation proceedings against Ms. Boismier, conducted the Revocation Hearing, and voted to revoke her license using public funds, from Defendant State Department of Education's public offices.

365. Defendants State Department of Education, State Board of Education, and Superintendent of Public Instruction initiated the revocation proceedings against Ms. Boismier, conducted the Revocation Hearing, and voted to revoke her license for the purpose of advancing their own religious ideology, which holds that being a member of the LGBTQ+ community is a sin, and children should not be exposed to members of the LGBTQ+ community or their viewpoints.

366. Defendants State Department of Education, State Board of Education, and Superintendent of Public Instruction thereby violated the Oklahoma Constitution's prohibition on using public resources for the purpose of advancing a particular religious viewpoint.

367. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## CLAIM FOURTEEN FOR RELIEF

**Deprivation of Due Process**
**Violations of Art. 2, Sec. 7 of Oklahoma Constitution**
**(Against All Defendants)**

368. Ms. Boismier hereby incorporates all preceding paragraphs of this Complaint as if fully set forth herein.

369. Article II, Section 7 of the Oklahoma Constitution enshrines the right of due process by providing that "[n]o person shall be deprived of life, liberty, or property, without due process of law."

370. Ms. Boismier is constitutionally entitled to due process under the state constitution.

371. As alleged herein, Ms. Boismier enjoyed a protected property interest in her teaching certificate and the opportunity for current and future employment based on that certificate.

372. As alleged herein, Defendants deprived Ms. Boismier of her teaching certificate and employment status without constitutionally adequate notice, hearing, or opportunity to contest the revocation, and without adherence to mandatory procedures.

373. At all times relevant to this claim, the Defendants' employees were acting under color and authority of state law and within the scope of employment.

374. This claim is not barred by the OGTCA because it does not challenge the discretionary substance of any licensing decision. It arises from Defendants' refusal to provide procedural due process guaranteed by Article II, Section 7, which exists independent of the "licensing powers" exception in 51 O.S. § 155(12).

375. Alternatively, the "licensing powers" exception to the OGTCA is not applicable when the plaintiff is only suing the employee in their individual capacity for torts committed outside of the scope of their employment." *Conner v. State*, 2025 WL 598786, at *8 (Okla. 2025). An employee's "scope of employment" is defined as "performance by an employee acting in good faith within the duties of his office or employment or of tasks lawfully assigned by a competent authority." *Speight v. Presley*, 203 P.3d 173, 176 (Okla. 2008) (citing 51 O.S. § 152(12)). Acting with malicious intent amounts to bad faith. *Midgley v. Alsip*, 2024 WL 3089654 * 2 (N.D. Okla. 2024). Whether someone acted in bad faith is a question for the jury. *Endicott v. Choctaw Cnty. City of Hugo Hosp. Auth.*, 2024 WL 1339404, *2 (E.D. Okla. 2024). Defendants

Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson acted with bad faith when they revoked Ms. Boismier's license without due process, as described herein.

376. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**CLAIM FIFTEEN FOR RELIEF**

**Negligent and/or Reckless Conduct**
**Violations of the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151 *et seq*.**
**(Against all Defendants)**

377. Ms. Boismier hereby incorporates all preceding paragraphs of this Complaint as if fully set forth herein.

378. The Oklahoma Governmental Tort Claims Act (OGTCA) waives sovereign immunity for the state and its political subdivisions for torts committed by employees acting within the scope of their employment.

379. Employees of the Oklahoma State Department of Education and the State Board of Education owed Plaintiff a duty of reasonable care in performing non-discretionary, procedural, and ministerial acts required by law once eligibility for reinstatement was established, including processing and forwarding documentation, scheduling required hearings, and communicating decisions within established deadlines.

380. Defendants breached that duty by failing or refusing, without legitimate justification, to perform mandatory procedural steps associated with reinstatement of Plaintiff's certificate, including processing her reinstatement request in accordance with agency rules and timelines. These failures directly interfered with Plaintiff's ability to regain employment and pursue her profession.

381. At all times relevant to this claim, the Defendants' employees were acting under color and authority of state law and within the scope of employment.

382. This claim is not barred by the OGTCA because it does not challenge the discretionary substance of any licensing decision. It arises from Defendants' negligent and/or reckless conduct, which violates a duty of care that exists independent of the "licensing powers" exception in 51 O.S. § 155(12).

383. Alternatively, the "licensing powers" exception to the OGTCA is not applicable when the plaintiff is only suing the employee in their individual capacity for torts committed outside of the scope of their employment." *Conner v. State*, 2025 WL 598786, at *8 (Okla. 2025). An employee's "scope of employment" is defined as "performance by an employee acting in good faith within the duties of his office or employment or of tasks lawfully assigned by a competent authority." *Speight v. Presley*, 203 P.3d 173, 176 (Okla. 2008) (citing 51 O.S. § 152(12)). Acting with malicious intent amounts to bad faith. *Midgley v. Alsip*, 2024 WL 3089654 * 2 (N.D. Okla. 2024). Whether someone acted in bad faith is a question for the jury. *Endicott v. Choctaw Cnty. City of Hugo Hosp. Auth.*, 2024 WL 1339404, *2 (E.D. Okla. 2024). Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson acted with bad faith when they revoked Ms. Boismier's license.

384. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## <u>CLAIM SIXTEEN FOR RELIEF</u>

**Invasion of Privacy – False Light**
**(Against all Defendants)**

385. Ms. Boismier hereby incorporates all preceding paragraphs of this Complaint as if fully set forth herein.

386. As alleged herein, Defendant Walters repeatedly painted those who supported trans people using the bathroom that aligns with their gender identity as pedophiles or pedophile supporters.

387. Moreover, in the Final Revocation Order, all Defendants claimed that Ms. Boismier "violated "OAC 210:10-29-2, OAC 210:2-29-3, and OAC 210:20-29-4 by circumventing district policy and [HB 1774]."

388. In so doing, those Defendants asserted publicly that Ms. Boismier (1) was not "guided in [her] conduct by their commitment to their students and their profession," OAC 210:20-29-2; (2) did not "make reasonable effort to protect the student from conditions harmful to learning or to health and safety," OAC 210:20-29-3(b)(4); (3) did not "exert every effort to raise professional standards, fulfill professional responsibilities with honor and integrity, promote a climate that encourages the exercise of professional judgment, achieve conditions which attract persons worthy of the trust to careers in education, and assist in preventing the practice of the profession by unqualified persons," OAC 210:20-29-4; and (4) circumvented state law HB 1775.

389. Defendants' portrayal of Ms. Boismier is untrue.

390. Defendants' portrayal of Ms. Boismier as a supporter of pedophiles or pedophilia, someone who did not protect students, someone who did not live up to professional standards, and someone who skirted state laws would be offensive to any person, and is especially offensive to Ms. Boismier, who dedicated her career to public education.

391. As alleged herein, Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Ms. Boismier would be placed.

392. This claim is not barred by the OGTCA because it does not challenge the discretionary substance of any licensing decision. It arises from Defendants' negligent and/or reckless conduct, which violates a duty of care that exists independent of the "licensing powers" exception in 51 O.S. § 155(12).

393. Alternatively, the "licensing powers" exception to the OGTCA is not applicable when the plaintiff is only suing the employee in their individual capacity for torts committed outside of the scope of their employment." *Conner v. State*, 2025 WL 598786, at *8 (Okla. 2025). An employee's "scope of employment" is defined as "performance by an employee acting in good faith within the duties of his office or employment or of tasks lawfully assigned by a competent authority." *Speight v. Presley*, 203 P.3d 173, 176 (Okla. 2008) (citing 51 O.S. § 152(12)). Acting with malicious intent amounts to bad faith. *Midgley v. Alsip*, 2024 WL 3089654 * 2 (N.D. Okla. 2024). Whether someone acted in bad faith is a question for the jury. *Endicott v. Choctaw Cnty. City of Hugo Hosp. Auth.*, 2024 WL 1339404, *2 (E.D. Okla. 2024). Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson acted with bad faith when they portrayed Ms. Boismier in a false light.

394. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## CLAIM SEVENTEEN FOR RELIEF

**Malicious Wrong**
**(Against Individual Defendants)**

395. Ms. Boismier hereby incorporates all preceding paragraphs of this Complaint as if fully set forth herein.

396. Malicious wrong is "[t]he intentional doing of that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another, or that other person's property or trade . . . if done without just cause or excuse." *Clinton HMA, LLC v. Clinton Hosp. Auth.*, 2023 WL 5668016 (W.D. July 25, 2023); *Mangum Elec. Co. v. Border*, 222 P. 1002, 1005 (Okla. 1923) (internal quotation marks omitted).

397. As alleged herein, Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson portrayed Ms. Boismier in a false light, accused her of failing to adhere to professional standards and skirting state laws, and revoked her teaching certificate in a way that was arbitrary, capricious, and not supported by the facts or law.

398. As alleged herein, the actions of the individual Defendants in revoking Ms. Boismier's teaching certificate was motived by malice and a desire to cause economic and personal harm to Ms. Boismier completely divorced from any legitimate exercise of governmental authority and was done without just cause or excuse for which these Defendants are liable to Ms. Boismier.

399. This claim is not barred by the OGTCA because it does not challenge the discretionary substance of any licensing decision. It arises from Defendants' negligent and/or reckless conduct, which violates a duty of care that exists independent of the "licensing powers" exception in 51 O.S. § 155(12).

400. Alternatively, the "licensing powers" exception to the OGTCA is not applicable when the plaintiff is only suing the employee in their individual capacity for torts

committed outside of the scope of their employment." *Conner v. State*, 2025 WL 598786, at *8 (Okla. 2025). An employee's "scope of employment" is defined as "performance by an employee acting in good faith within the duties of his office or employment or of tasks lawfully assigned by a competent authority." *Speight v. Presley*, 203 P.3d 173, 176 (Okla. 2008) (citing 51 O.S. § 152(12)). Acting with malicious intent amounts to bad faith. *Midgley v. Alsip*, 2024 WL 3089654 * 2 (N.D. Okla. 2024). Whether someone acted in bad faith is a question for the jury. *Endicott v. Choctaw Cnty. City of Hugo Hosp. Auth.*, 2024 WL 1339404, *2 (E.D. Okla. 2024). Defendants Walters, Lepak, Archer, Burdick, Quebedeaux, and Wesson acted with bad faith when they committed a malicious wrong against Ms. Boismier.

401. As a result of Defendants' reckless and/or willful disregard of her rights, Ms. Boismier suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award her all relief as allowed by law, including but not limited to the following:

a) All declaratory relief and injunctive relief, as appropriate, including, but not limited to, enjoining unconstitutional sections of HB 1775 and its implementing regulations;

b) Actual economic damages, including but not limited to back pay, front pay, and lost benefits, as established at trial;

c) Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

d) Punitive damages for all claims as allowed by law, to the maximum amount permitted and in an amount to be determined at trial;

e) Exemplary damages for all claims as allowed by law, to the maximum amount permitted and in an amount to be determined at trial;

f) Prejudgment and post-judgment interest at the highest lawful rate;

g) A tax-offset;

h) Attorneys' fees and costs; and

i) Such further relief as justice requires, including further injunctive relief against all Defendants to cease and desist from discrimination, retaliation, and censorship.

DATED: this 31st day of October, 2025.

Respectfully submitted,

*/s/ Iris Halpern*
Iris Halpern*
Colo. Bar No. 53112
Azra Taslimi*
Colo. Bar No. 44317
Stephanie Wise*
Colo. Bar No. 60626
Neil Sandhu*
Colo. Bar No. 56600
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
ih@rmlawyers.com
at@rmlawyers.com
sw@rmlawyers.com
ns@rmlawyers.com

*Pro Hac Vice Pending*

*/s/ Spencer Bryan*
Spencer Bryan
OBA No. 19419
Steven Terrill
OBA No. 20869
BRYAN & TERRILL
2500 S. Broadway, 122
Edmond, OK 73013
T/F: (918) 935-2777
jsbryan@bryanterrill.com
sjterrill@bryanterrill.com

*Attorneys for Plaintiff*